COMMONWEALTH *vs.* FRANCIS K. STEWART.

Middlesex.     February 4, 1974. — April 10, 1974.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Identification.     Practice, Criminal,* Disclosure of evidence before grand jury.     *Robbery.*

The in-court identifications of a defendant by two robbery victims, whose observations at the scene provided independent basis for the identifications, were not tainted by the victims' suppressed "one on one" identifications of the defendant at a police station. [101-102]

This court's reading of a prosecution witness's grand jury testimony confirmed the fact that the defendant, who had access to a statement the witness gave the police and who had cross-examined him at the probable cause hearing and at trial, was not harmed by denial of his motions below for access to that grand jury testimony. [104]

Hereafter, absent special reason for nondisclosure, a defendant charged with a crime may, without showing a "particularized need," routinely obtain his own testimony before the grand jury and that of any prosecution witness which is related to the subject matter of his testimony at trial. [105-106]

A defendant who, using threat of force, removed cash from a supermarket safe in the presence of the night manager and a meat cutter was properly convicted under G. L. c. 265, § 17, of robbery from the person of the meat cutter. [108]

In a case tried prior to *Commonwealth* v. *Brown,* 364 Mass, 471 (1973), there was no error in handcuffing a defendant charged with robbery, or two defence witnesses then incarcerated, in view of the physical location and condition of the court room, the defendant's criminal record, and the previous association of the two witnesses with the defendant. [108-109]

INDICTMENTS found and returned in the Superior Court on April 10, 1970.

The cases were tried before *Ford, J.*

*James V. McManus* for the defendant.

*Bonnie H. MacLeod-Griffin*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J.    About 9 P.M. on March 4, 1970, Willard Iversen, night manager, and James Moore, meat cutter, were standing behind the entrance doors of the First National supermarket in Reading. Iversen was preparing to secure the doors and close the store; some carts left on the outside were being brought in. Iversen and Moore then observed the defendant and another man, full face, making their way from the outside through the outer and inner glass doors. (There was excellent lighting throughout.) As the defendant entered, with the second man behind him, Iversen said that he was sorry, the store was closed. The defendant produced a gun in his right hand and ordered Iversen to take him to the safe. At the same time the second man seized Moore by the back of his jacket and began "hustling" him.

On entering and showing the weapon, the defendant had attempted with his left hand to pull up a mask (resembling a surgical mask) from around his neck to cover his mouth and nose, but it fell to his chin. The second man, attempting the same maneuver with his mask, evidently was better able to adjust it over his nose.

In response to the defendant's command to go to the safe, Iversen turned; the defendant put his gun to Iversen's back; Iversen, with the defendant behind him, began walking toward the area of the store where the safe was located. As he felt the pressure of the gun, Iversen turned his head, again seeing the defendant full face, and said, "Please don't shoot." Meanwhile Moore, while being shoved along, had a side view of the defendant. All four arrived at the safe. It was shut but not locked. The defendant pulled open the door of the safe with his left hand. The second man withdrew from the safe six banded packets, each of 100 one dollar bills, and $20 in nickels, and put the money in a bag

which he produced from inside his coat. Moore had the defendant in sight while the money was taken from the safe; what view Iversen had at the time was not brought out so plainly in the record. As the second man said that he had all the money, or words to that effect, he and the defendant started running to the entrance door. They fled in a yellow Mustang. A boy, who while pushing carts had seen the defendant and the second man entering the store and commandeering Iversen and Moore, now observed the robbers making their getaway. He noted the license plate number and promptly told Iversen, who called the Reading police.

The police quickly caught up with a yellow Mustang. A chase followed in which shots were fired from that car. This and other ensuing events need not be recounted. Within an hour the defendant and the second man had been apprehended, brought to the Reading police station, and arrested.

On evidence as sketched above, together with in-court identifications by Iversen, Moore, and the boy, and other proof, the defendant was found guilty by a Middlesex jury on an indictment for armed robbery of the property of First National from the person of Moore, and an indictment for illegal possession of a firearm; the jury acquitted him on an indictment charging armed assault with intent to murder. His appeal under G. L. c. 278, §§ 33A-33G, raises four points. We find no error. The second point, however, prompts us, pending formulation and adoption of Rules of Criminal Procedure, to outline a procedure to be followed in the future with respect to the disclosure of grand jury testimony to the defence for use during trial.

1. The defendant claims error (assignment 4) in the judge's refusal to suppress the in-court identifications of the defendant by Iversen and Moore, on the ground that these were indelibly tainted by the "one on one" identifications of the defendant by these witnesses which occurred at the Reading police station sometime after ten o'clock on the night of the robbery. At a pre-trial hearing before the trial judge on the defendant's motion to sup-

press, it appeared that, after receiving *Miranda* warnings at the station house, the defendant telephoned his attorney who spoke with a police officer on duty and requested, in. effect, that no identification be attempted until he, the attorney, arrived. The police had asked Iversen and Moore to come to the station to see whether they could recognize some suspects who had been picked up. Iversen and Moore went to the station and, on seeing the defendant without other persons (or other civilians) present, they separately indicated that he was one of the robbers (the one with the gun). The defendant's attorney arrived at the police station after these identifications had been made.

The Commonwealth, considering the identifications at the station to have been unfair to the defendant, was content to have them suppressed,[1] the judge so ordered, and there was no reliance on them at trial. The question, then, was whether the observations made by the witnesses on the occasion of the robbery itself provided an independent, uncontaminated source for in-court identifications. The witnesses were examined and cross-examined at the pre-trial hearing as to their viewing of the defendant during the robbery, and the judge found firmly that the independent basis existed. A glance back at our sketch of the facts of the robbery will indicate that there was plenty of ground for the judge's finding. See *Commonwealth* v. *Denault*, 362 Mass. 564, 566-567 (1972); *United States* v. *Wade*, 388 U. S. 218, 241 (1967).

2. The defendant's counsel made repeated motions — including motions before trial, after the direct examination of Iversen as a Commonwealth witness at trial, and after Iversen's recross-examination — for an opportunity to read the testimony that Iversen had given before the grand jury or, failing that, for an undertaking on the part of the judge that he would himself read the grand jury testimony and, if

---

[1] This was before the decision of *Kirby* v. *Illinois*, 406 U. S. 682 (1972), refusing to extend *United States* v. *Wade*, 388 U. S. 218 (1967), and *Gilbert* v. *California*, 388 U. S. 263 (1967), regarding the right of an accused to the presence of counsel at a lineup, to the situation of a lineup taking place after arrest but before indictment or other formal charge.

he saw fit, disclose it to counsel.[2] The motions were denied (assignment 8). It is the refusal to give access to the grand jury testimony after Iversen had testified at the trial that is now insisted on by the defendant as error,[3] and is discussed here.

We have said in the past that disclosure to the defence of the grand jury testimony of Commonwealth witnesses was largely discretionary with the trial judge, see *Commonwealth* v. *Ries*, 337 Mass. 565, 583 (1958); *Commonwealth* v. *Cook*, 351 Mass. 231, 232-233 (1966), cert. den. sub nom. *Cook* v. *Massachusetts*, 385 U. S. 981 (1966); *Commonwealth* v. *Abbott Engr. Inc*. 351 Mass. 568, 578-579 (1967), and that disclosure was in any case dependent on a showing of a "particularized need"[4] that overcame the policies justifying grand jury secrecy.[5] *Commonwealth* v. *Ladetto*, 349 Mass. 237, 244-245 (1965). *Commonwealth* v. *Doherty*, 353 Mass. 197, 209-210 (1967). *Commonwealth* v. *Gordon*, 356 Mass. 598, 602-603 (1970). "Particularized need" would be shown, no doubt, when it was admitted or somehow demonstrated that the grand jury testimony contradicted in a material way the testimony given by the same witness at trial, and could thus be used to impeach him or shake his credibility or refresh his memory. See *Commonwealth* v. *Doherty, supra,* at 209-210; *Commonwealth* v. *Carita*, 356 Mass. 132, 140-142 (1969). Less certainly, the need could be established by pointing to

---

[2] The testimony was available for transcription. It is to be noted that under Rule 101D of the Superior Court (effective September 1, 1971, and thus antedating the trial herein), "[s]tenographic notes of all testimony given before any grand jury shall be taken by a stenographer, who shall be appointed by a justice of the superior court and who shall be sworn. Unless otherwise ordered by the court, the stenographer shall furnish transcripts of said notes only as required by the prosecutor who introduced the testimony, whether district attorney or attorney general."

[3] Counsel conceded that his pre-trial motion was not supported by a showing of "particularized need"; see the treatment below of that requirement.

[4] The words appeared in *United States* v. *Procter & Gamble Co*. 356 U. S. 677, 683 (1958); see also *Pittsburgh Plate Glass Co*. v. *United States*, 360 U. S. 395, 400 (1959).

[5] Those policies are enumerated in Smith, Criminal Practice and Procedure, § 621 (1970).

contradictions or other weaknesses in the testimony of the witness at trial, which might possibly be aggravated (or resolved) by looking at what the witness had said previously to the grand jury. Cf. *Commonwealth* v. *De Christoforo,* 360 Mass. 531, 534-536 (1971), and Spiegel, J., dissenting at 555-556. Even where the need was not proved, but only suggested, the judge might still choose to read the grand jury minutes himself, in camera, with a view to determining whether inconsistencies existed, and in suitable cases then authorizing disclosure to the defence. *Commonwealth* v. *Carita, supra,* at 141-142; *Commonwealth* v. *French,* 357 Mass. 356, 377-378 (1970); *Commonwealth* v. *De Christoforo, supra,* at 535-536. See, generally, Smith, Criminal Practice and Procedure, §§ 621-626 (1970).

We shall be asserting in a moment that the system just described is faulty and should be revised, but first we need to say that it seems to us plain that the defendant here was not hurt by the denial of disclosure. Defence counsel had cross-examined Iversen at the probable cause hearing and also had access to a statement that Iversen gave to the police shortly after the robbery. Counsel engaged in a lengthy cross-examination of Iversen at trial aimed at attacking his identification of the defendant and mostly concerned with whether and how far the defendant's face mask had slipped, but this produced no significant inconsistencies; at most the witness committed some verbal slips induced by the tedious repetition of questions. On the appeal to our court Iversen's grand jury testimony was transcribed and sent forward to us and out of abundance of caution we have read it with consent of the parties. Compare *Commonwealth* v. *Gallinaro,* 360 Mass. 868 (1971), cert. den. sub nom. *Gallinaro* v. *Massachusetts,* 406 U. S. 945 (1972), with *Commonwealth* v. *De Christoforo, supra,* at 535-536 and n. 2. It appears to us to furnish no further foothold for attacking the identification by Iversen.

Although the current procedure did not result in injustice to the defendant in the present case and may have worked none in the mine run of cases, we think it has been

intrinsically unsound. Except where the content of the grand jury record was in substance already known, it was often impossible for the judge to rule with any assurance that a particularized need had or had not been shown without examining the grand jury transcript himself. But when he did undertake to read that record he was assuming vicariously and uncomfortably the role of counsel. See *Dennis* v. *United States*, 384 U. S. 855, 874-875 (1966). Were there, moreover, any real causes for nervousness — causes that could not be removed[6] — about disclosure to the defence of the grand jury testimony of a person who had actually told his story openly from the witness stand at trial? To withhold such material when proper judicial safeguards could be provided ran counter to the growing belief that — as the Supreme Court put it — "[i]n our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant facts." *Id.* at 873.

These considerations were not overlooked by the majority of the court in *Commonwealth* v. *De Christoforo, supra,* at 535-536, and were strongly urged in a dissenting opinion, *id.* at 550-556, but the majority believed that revision of the going procedure would be better accomplished by rulemaking than by judicial decision. A Committee on Criminal Rules has been at work on this and many other problems in an effort to produce a comprehensive set of criminal rules paralleling the new Rules of Civil Procedure,[7] but it is evident that the project cannot be brought to a conclusion for some time to come. Pending formulation and adoption of a precise rule, we think the problem should be met by judicial statement. (The committee will of course remain free to recommend a rule that may deviate from this statement.)

Hereafter, on the defendant's motion, the court will routinely order the Commonwealth to supply defence

---

[6] See, below, a procedure for limiting the scope of the disclosure in appropriate cases.

[7] The Committee was organized under the aegis of the Judicial Conference.

counsel with the grand jury testimony of the defendant himself, and with the grand jury testimony of any person called as a Commonwealth witness which is related to the subject matter of his testimony at trial.[8] The defence will not be required to show "particularized need." If there is special reason why this routine should not be followed in a particular case, the Commonwealth should present it on the hearing of the motion. For example, the Commonwealth may urge that the testimony of a given witness should be withheld or portions excised in order to protect persons mentioned or for other reasons of security;[9] so also the Commonwealth may urge that disclosure be limited on grounds of irrelevance. Where such contentions are made, the judge may be obliged to examine the grand jury minutes in camera to inform himself and reach a proper decision. If disclosure is denied or limited and the defendant objects, the material in question should be identified so that in case of conviction of the defendant and appeal it may be sealed and transmitted to the reviewing court.

The arrangements made should insure that the grand jury testimony of a Commonwealth witness shall be furnished not later than the close of his direct testimony at trial; and the grand jury testimony of the defendant, not later than the commencement of the trial. But to avoid delays in the conduct of trials, counsel on both sides should attempt where feasible to agree in advance on a reasonable timetable for the supply of the transcripts. In some cases it should be possible and may be desirable to arrange for the furnishing of the material ahead of trial as to witnesses whom the Commonwealth will definitely call.

In deciding to make the foregoing statement, we have been aided by a consideration of the development of the subject in the Federal courts. Those courts started with a

---

[8] The court's order can deal with the time for preparing and delivering transcripts as well as with provision for payment of the cost. As indicated below, agreement between counsel is to be encouraged and can greatly assist the court.

[9] A security problem can sometimes be solved by allowing defence counsel to see the material on the understanding that it will not be further disclosed.

Commonwealth *v*. Stewart.

requirement of a showing of "particularized need" for the furnishing to the defence of the relevant grand jury testimony of government witnesses.[10] *Pittsburgh Plate Glass Co.* v. *United States*, 360 U. S. 395, 400 (1959). After the decision of *Dennis* v. *United States*, 384 U. S. 855 (1966), from which we have quoted above, the showing of need demanded by the courts seems in some cases to have become nominal. *Schlinsky* v. *United States*, 379 F. 2d 735, 740 (1st Cir. 1967). In a number of the circuits, moreover, the requirement was altogether eliminated by decisions of the respective courts of appeals, and the supply of the grand jury testimony of government witnesses was routinized on lines similar to those approved in the present opinion. *United States* v. *Youngblood*, 379 F. 2d 365 (2d Cir. 1967). *United States* v. *Amabile*, 395 F. 2d 47 (7th Cir. 1968), vacated on other grounds and remanded to the District Court sub nom. *Amabile* v. *United States* in *Giordano* v. *United States*, 394 U. S. 310 (1969). *Harris* v. *United States*, 433 F. 2d 1127 (D. C. Cir. 1970). See annotation, 3 A. L. R. Fed. 29 (1970). Finally, a comparable result for all Federal courts was brought about by a 1970 amendment of the Jencks Act. See 18 U. S. C. § 3500 (1970), as amended by P. L. 91-452, Title I, § 102, 84 Stat. 926, October 15, 1970.[11] There are, likewise, State statutes routinizing the disclosure of grand jury testimony. See *Commonwealth* v. *De Christoforo, supra,* at 553 (dissenting opinion); annotation, 7 A. L. R. 3d 8 (1966). Reference should also be made to the A. B. A. Standards Relating to

---

[10] Rule 6 (e) of the Federal Rules of Criminal Procedure allows for the furnishing of such testimony "preliminarily to or in connection with a judicial proceeding."

The delivery to the defence of the grand jury testimony of the defendant himself is covered by Rule 16 (a) of those rules.

[11] The statute now provides that after a government witness has testified on direct examination, the court on the defendant's motion shall order the United States to produce his grand jury testimony so far as it relates to the same subject matter. If the government claims that the matter ordered produced contains irrelevancies, the court is to inspect it in camera and make any proper excisions (the entire text being preserved for appeal purposes). When a transcript is delivered to the defendant, the court may recess proceedings to allow him time to prepare to use it at trial. On failure of the United States to comply with an order for delivery, the court strikes the witness's testimony unless it decides that a mistrial is required in the interests of justice.

Discovery and Procedure before Trial, § 2.1 (a) (iii) and pp. 54-56, 64-66; §§ 2.2, 2.6 (Approved Draft 1970). See, generally, Sherry, Grand Jury Minutes: The Unreasonable Rule of Secrecy, 48 Va. L. Rev. 668 (1962); Calkins, Grand Jury Secrecy, 63 Mich. L. Rev. 455 (1965).

3. In his instructions to the jury, the judge said in substance that if the jury believed the facts as to Moore (as outlined above), they would be justified in finding the defendant guilty under the armed robbery indictment which, it will be recalled, charged a robbery from the person of Moore, not Iversen. By objections and exceptions to the judge's denial of a directed verdict of acquittal (assignments 9, 16) which implicated the correctness of the instructions, the defendant contended that, assuming a robbery, it was Iversen, not Moore, who should have been named, because Iversen as night manager had a responsibility with respect to the money in the safe, whereas Moore, as a meat cutter, did not. The point is not well taken. While the statute, G. L. c. 265, § 17 (see also c. 277, § 39), speaks of taking "from his [the victim's] person," this is understood to include the common law conception of taking in a victim's "presence," see *Commonwealth* v. *Jones*, 362 Mass. 83, 87 (1972), and this in turn is read to cover cases where the victim could have prevented the taking, had he not been intimidated. Cf. *Commonwealth* v. *Homer*, 235 Mass. 526, 533 (1920); *Commonwealth* v. *Weiner*, 255 Mass. 506, 508-509 (1926); *People* v. *Braverman*, 340 Ill. 525, 530-531 (1930); LaFave and Scott, Criminal Law, § 94, p. 696 (1972). Thus, if force or threat of force had been applied to a customer remaining in the First National supermarket at closing time who was trying to interpose himself or to call the police, a charge of robbery from that customer with respect to money of First National could have been sustained; a fortiori may a charge of robbery from Moore be sustained, for as an employee he had a duty of loyalty toward his employer and thus some protective concern for the money.

4. Over protests duly made (assignments 1, 3, 14), the defendant, who was in custody for failure to give bail, was

kept in handcuffs during trial, and two of his witnesses testified while in handcuffs. The latter were the second man, and another, both of whom had pleaded guilty to charges growing out of the robbery, and were then incarcerated at Walpole. The trial took place, of course, well before this court in the case of *Commonwealth* v. *Brown*, 364 Mass. 471 (1973), laid down future guidelines on the subject of unusual security measures in the court room. The judge's approach to the question was more casual than we would want it to be, and his dependence on advice of the custodial authorities rather marked; yet we think there is not sufficient basis for rejecting his judgment that handcuffs should be applied, or for a conclusion that a fair trial was not had. The physical location and condition of the court room, the defendant's previous criminal record, the previous association of the two witnesses with the defendant (and the circumstance, which could not in any event have been kept from the jury, that these witnesses were currently prisoners) — these factors support the judge's action on appeal, though they might not have persuaded us in the first instance, and might not have persuaded the trial judge himself, if he had been obliged to follow the procedure called for by the *Brown* case. We note that the defendant's counsel, while objecting to the shackling, did not ask the judge to charge the jury on its significance, or rather lack of significance, in relation to finding a verdict.

*Judgments affirmed.*