COMMONWEALTH *vs.* WALTER M. LEWINSKI.

Suffolk. March 4, 1975. — June 3, 1975.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Homicide. Practice, Criminal,* Charge to jury, Suppression of evidence by prosecutor, Discovery, Disclosure of statements by witnesses.

Where evidence at a trial for the murder of a woman permitted a verdict that the defendant was guilty of voluntary manslaughter but he was convicted of murder in the second degree, there was no error in the judge's denial of a request for an instruction on involuntary manslaughter based only on the defendant's exclamation of surprise, "My God, I have shot her." [891-897]

There was no error in the denial of a pre-trial motion to dismiss an indictment for murder of a woman in an apartment by reason of the failure of the investigating police officer to inform the medical examiner promptly of an intimation by another occupant of the apartment that there had been sexual intercourse with the victim just before she was shot, information which could have led to the typing of sperm in her vagina, where there was no evidence of negligence on the officer's part under accepted standards. [897-900]

There was no error in the denial of a pre-trial motion for disclosure of statements given by prospective prosecution trial witnesses to police at headquarters shortly after a murder where the defendant failed to renew the motion at the close of the direct testimony of the witnesses. [900-901]

This court abandons a showing of a "particularized need" by a defendant in a criminal case as a condition of his securing disclosure of prior written statements of prosecution trial witnesses. [901-902]

Statement of procedures to be followed upon a motion by a defendant in a criminal case for disclosure of available pertinent written statements of prosecution trial witnesses. [902-903]

INDICTMENT found and returned in the Superior Court on September 19, 1973.

The case was tried before *McLaughlin,* C.J.

*Kenneth Weiss* for the defendant.

*Thomas J. Mundy,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. In a case appealed subject to G. L. c. 278, §§ 33A-33G, the defendant Walter M. Lewinski was tried to a jury in the Superior Court and convicted on an indictment for murder in the second degree of a young woman. The defendant seeks reversal of the conviction for any of three claimed errors assigned and argued: (1) that the trial judge, although charging the jury on murder in the second degree and voluntary manslaughter, refused erroneously to charge them on an alternative of involuntary manslaughter; (2) that the Commonwealth deprived the defendant of a constitutional right in that the police were delinquent in failing to follow up on evidence (sperm in the body of the victim) that might have assisted the defendant in his defense, and the judge should accordingly have dismissed the proceeding; (3) that the judge mistakenly denied the defendant's motion, made before trial, to compel the prosecution to provide his counsel with access to statements given to the police by three persons who were to appear as witnesses for the Commonwealth, James Anthony Smith (charged as accessory after the fact to the murder, his case being severed from the defendant's), Patricia Thompson and Larry Fowler. None of the grounds urged has merit, but the appeal provides a proper occasion for a statement about future practice in regard to defendants'

demands to examine statements in the control of the prosecution made by witnesses whom the prosecution intends to call. Compare *Commonwealth* v. *Stewart,* 365 Mass. 99, 102-108 (1974), where we approve for the future a change of the practice regarding discovery of testimony before the grand jury.

1. We summarize the substance of the case against the defendant which lay in the testimony of the three witnesses above mentioned, and a fourth, Clarence W. Nassaro, and in certain physical evidence.

Smith's testimony ran thus. He occupied apartment 2B on the second floor of the premises 224 Tremont Street, Boston. The defendant, whom Smith had known for two and a half years, had stayed with him on the night of August 15-16, 1973, and Smith spent most of the next day with him. About 6 P.M. on August 16 the two dropped into apartment 2C and visited with the occupants, Miss Thompson and Fowler, whom they had known for some time.[1] They stayed for a half hour or more. On leaving, they went from bar to bar in the neighborhood, starting at "Jerome's" (where Smith worked as a bartender), both drinking heavily, Smith becoming more sodden than the defendant.

About 12:30 A.M. the defendant and Smith walked back to 224 Tremont Street. Smith handed the defendant a key to the street door; the defendant had earlier been given a key to the apartment door. Smith went by elevator alone to his apartment and, being quite drunk, promptly "passed out" on one of the two cots in the "studio" room which, with kitchenette space and a bathroom, in effect constituted the apartment.

Smith was awakened by the voice of the defendant, entering the apartment with a woman whom Smith did not recognize. The lights were not on. Smith observed or heard the defendant and the woman commencing to

---

[1]Prior to June, 1973, Smith had resided with Miss Thompson and Fowler at a place on LaGrange Street, Boston, and the defendant had stayed there with them for a short period.

make love on the other cot.  Smith drifted back to sleep, having been awake for perhaps five minutes.

Some time later, still in the early morning, Smith was awakened by a loud report, a gunshot.  He saw the defendant standing at the bathroom door in the bathroom light with a gun in his hand — Smith believed it to be his own .357 magnum revolver — and wearing pants, but without a shirt, shoes, or socks.  The defendant said, "My God, I have shot her."  Smith, rising and walking a few steps from his cot to the bathroom, saw the naked body of a woman sprawled half in and half out of the bathtub, her face smashed and running blood.  She was dead.

The defendant said, "You are going to have to help me with the body or do something with the body."  Smith said, "All right."  The defendant put the gun on the kitchenette counter.  The two men lifted the body from the tub and laid it on the floor of the bathroom, and then contrived to wrap it (together, evidently, with some of the woman's clothing) in a sheet taken from one of the cots.  The defendant went into the hallway outside apartment 2B to see whether the way was clear.  Smith did the same.  Back in 2B they picked up the sheeted burden between them and carried it down a back stairs opening on an alley adjacent to 224 Tremont Street and extending to Stuart Street.  They laid the body, still wrapped in the sheet, on the ground some distance down the alley, and cast the articles of clothing on a trash barrel nearby (the clothing was later retrieved by the police).

The defendant and Smith then returned by the stairs to the apartment and mopped up the bathroom with towels or other material at hand.  They put these things and the woman's shoes in two paper bags and, carrying the bags, left, taking the elevator to the street.  They rid themselves of the bags by throwing them into a trash receptacle behind the Town House Apartments in the vicinity. (The trash was removed too soon to permit retrieval of

the bags by the police.)  The men then walked into the
Chinatown district, had coffee at a restaurant there, and
returned to the neighborhood of 224 Tremont Street.  The
defendant said he wanted to go upstairs, and "Let me
have a couple of hours," or "I will be a couple of hours."
He entered the street door of the building.  Smith walked
about the streets for an hour and a half or so.  Returning
to the apartment about 5 A.M., he noticed that his blue
overnight bag was missing.  The defendant was gone.
Smith had encountered the building superintendent, Peter
Kantos (occupant of apartment 2A),[2] in the hallway, and
the two met in the Saxon Coffee Shop a few minutes
later.  Very shortly, two unmarked police cars arrived on
the scene; Smith saw Miss Thompson in one of them.
Smith was picked up and let the police into apartment
2B; thereafter he was taken to police headquarters.

The testimony of Miss Thompson and Fowler may be
taken in part together.  Miss Thompson testified that the
defendant during the visit at 6 P.M. displayed a "western
type" gun that he kept tucked in his belt.  After the
defendant and Smith left apartment 2C sometime before
7 P.M., Miss Thompson and Fowler went to the movies,
returned, and went to bed between 11 P.M. and mid-
night.  About 2:50 A.M. Miss Thompson was awakened
by a woman's screams which continued intermittently for
about thirty minutes.  The woman (whose voice she did
not recognize) was screaming, "My neck, my neck,
Wally, my neck, please let go of my neck.  You are
hurting me."  A man's voice kept saying "Shut up"; Miss
Thompson recognized this voice as the defendant's.  She
woke Fowler, then went into the hallway; the noise was
coming from apartment 2B.  As she came back, she
heard a gunshot, followed by silence.  She panicked,
shut and locked the door.  Looking through a peephole
in the door, she saw the defendant come out of 2B and

[2] Kantos had not been awakened by screams or gunshot.  See ns. 3
and 4, infra.

look up and down the hallway; a second man (whom she could not see clearly) also came out; they returned to 2B. Thereafter she heard stumbling down the rear stairs. She and Fowler opened a window from which the alleyway could be seen. She saw a person walking out into the alleyway and back into the building; the second time she looked, she saw on the ground a woman's body in a white sheet. She got dressed, as did Fowler. The elevator was heard to come up and go down.

Fowler, after being wakened, heard a woman's voice saying repeatedly, "Please don't hurt me. You know I love you," and the male voice saying, "Keep it down," or "Shut up." He may not have been paying close attention at the time; in all events he did not recognize the voices. He heard the shot, and the noise on the back stairs. Looking through the window, he saw the defendant come into the alley, return to the building, and back out, half carrying the body. He heard noises of people coming up the back stairs and reentering apartment 2B, and through the peephole he saw the defendant preparing to leave the building carrying a paper bag. He did not see anyone with the defendant at this time. After getting dressed, he went down to the alleyway, and tried the woman's pulses. She was dead. He rejoined Miss Thompson and together they walked or taxied to the residence of their boss at Garden Street on Beacon Hill and talked with him. Here a telephone call was made to the police (there was no telephone in apartment 2C). The police drove them to 224 Tremont Street and to headquarters.

The witness Nassaro, a bus driver for the Massachusetts Bay Transportation Authority, on the 6:33 A.M. run on August 17 from Airport station to Logan airport, had the defendant, whom he knew, as a passenger. The defendant told him he was going to Albany "to school or something" for a company he was working for, and asked what air line he should take. Nassaro said, in a "kidding" way, "I won't tell anybody you are leaving

town, I won't even tell . . . [the victim]." Nassaro
knew the victim and had seen her numerous times; a few
times with the defendant.[3]

The police had started to converge on the alleyway
about 5 A.M. Sergeant Detective Joseph A. Kelley of the
homicide unit was in charge. A search of apartment 2B
turned up a woman's pocketbook, from the contents of
which the identity of the body of the victim could be
traced; also a .22 caliber Colt derringer, and miscellane-
ous spent and live ammunition, but not a .357 magnum
revolver. (It may be mentioned here that Smith was
admittedly an illicit dealer in guns, who had engaged in
numerous gun transactions, but while admitting owner-
ship of a .357 magnum revolver, which he said he cus-
tomarily kept on a shelf in a closet, he denied any
knowledge of the derringer.)

The medical examiner had arrived at the alleyway
about 5:15 A.M. and had the body removed to the south-
ern district mortuary. An autopsy was performed at
3 P.M. that day and revealed the cause of death as a
wound made by a bullet, fired from within three feet,
entering below the right eye and lodging in the brain.
The spent bullet, recovered, was a .22 caliber, copper
clad bullet which according to the ballistician was not
fired from the derringer or from a .357 magnum. There
was a black and blue area at the right corner of the lips
and inside the mouth that could have come from a blow;
and a contusion and abrasion of the neck that could have
resulted from application of force within an hour of
death. Blood alcohol content was 0.27 per cent, in-
dicating heavy drinking.

---

[3] Smith, Miss Thompson, and Fowler testified they knew the victim
in only a casual way — saw her occasionally around town. Miss
Thompson further testified that during that summer she had seen the
victim in front of 224 Tremont Street with two men, neither being
the defendant or Smith. Kantos said that he had seen the victim and
the defendant sitting in the same bar a couple of weeks before the
crime, but there was a man between them.

The prosecution's case as just outlined remained in substance unaffected; we note in the margin some of the points attempted to be made by the defense on cross-examination of the prosecution witnesses.[4] The defendant did not take the stand and the short case put in by the defense was not weighty.[5]

In this condition of the case, the defendant's assignment of error for failure of the judge to charge on involuntary manslaughter fails. The defendant has abandoned his assignment that there was insufficient proof to support the murder conviction, and the alternative offered to the jury of voluntary manslaughter — a slaying without malice in the heat of passion or anger

---

[4] On cross-examination, the defendant's counsel elicited the following:

Smith said he was bisexual, but that he was not sexually attracted to the defendant. Counsel appeared to suggest that Smith might have killed the victim out of jealousy, but also that Smith may have had intercourse with the victim that night.

Counsel suggested that though Smith testified he kept the .357 magnum revolver on a shelf in a closet without covering, he had said in his statement at headquarters that he kept it in a leather case. The prosecution then indicated that there was no such remark in Smith's statement.

Miss Thompson and Fowler both admitted they had not mentioned the defendant's gun at the probable cause hearing or before the grand jury, but Miss Thompson said the question had not been asked.

Kantos said on cross-examination that Miss Thompson told him at police headquarters that she had seen Smith, together with the defendant, carry the body into the alleyway (she had not so testified at the trial) and she also suggested to Kantos that she feared the defendant would influence Smith against Fowler and herself. (Smith, when residing at LaGrange Street with Miss Thompson and Fowler, had at times supported the household.)

[5] The defense offered as a witness an old classmate of the defendant who said he had seen Smith, the defendant, and the victim together at "Edward's Lounge" about 1 A.M. on August 17, and that the defendant was the last of the three to leave the place. The witness was badly shaken on cross-examination. The only other witness offered by the defense was a police officer, friendly with the defendant, who testified to the defendant's calling in to inquire whether he was wanted (but declining to reveal where he was) and surrendering himself on August 21.

— seems to us the limit of indulgence permitted by the evidence. An instruction on involuntary manslaughter — a slaying through wanton or reckless conduct, see *Commonwealth* v. *Clark*, 363 Mass. 467, 471-472 (1973); *Commonwealth* v. *Coleman*, 366 Mass. 705, 712-713 (1975) — was unwarranted because this was an hypothesis without foundation in the evidence. See *Commonwealth* v. *Campbell*, 352 Mass. 387, 392 (1967). Here the pattern of evidence which the jury could accept or not consisted of a continual quarrel and struggle with the victim over a period of time, use of a deadly weapon, a firing at near point blank, an instantly formed resolution to remove the body and conceal the crime, followed by attempted flight. The defendant's use of the expression "My God" with its hint of surprise is all that can be taken even to suggest involuntary manslaughter, and we think the judge was not in error to think this quite insufficient to justify an instruction on such a basis. We may add that it seems unlikely that a jury who passed over a possibility of voluntary manslaughter, and brought in a murder verdict instead, would have been attracted to the category of involuntary manslaughter.

2. With regard to the claim of such misprision by the Commonwealth through its police as to invalidate the prosecution entirely, we must record additional facts. A warrant issued for the defendant on a murder charge on the afternoon of August 17. The defendant surrendered himself in the company of counsel on August 21. During the arraignment and bail proceedings on that day, counsel learned some details of the police version of the homicide including the possibility or likelihood (through the statement given by Smith to Sergeant Detective Kelley at headquarters between 8 A.M. and 9 A.M. on August 17) that there had been intercourse with the victim just before the shooting. Counsel got in touch with the medical examiner the following day, August 22, and inquired whether sperm had been recovered from the body during the autopsy which could be used for typing

(a procedure analogous to typing blood). The medical examiner said that it had not been looked for, but he promised to do what he could. Accordingly, the medical examiner went promptly to the funeral home to which the body had been removed preparatory to burial, and withdrew matter from the vagina, from which the examiner made a smear revealing sperm. For typing, however, a liquid sample would be needed uncorrupted by embalming fluid; but the body had already been embalmed.

The defendant moved before trial to dismiss the case on the ground that possible exculpatory evidence had been lost to the defense through "intentional omission or negligence of the government." The exception to the denial of this motion, assigned as error, claims that "the Commonwealth through gross negligence suppressed evidence to the prejudice of the defendant." A pre-trial hearing was held on the motion at which the facts above stated were testified to. The defendant's position was that Kelley should have informed the medical examiner promptly of Smith's intimation of intercourse, whereupon the examiner should have taken a liquid sample, typing should have occurred, and the defendant would then possibly have been found by the typing not to have been the source of the sperm, thus discrediting Smith (and possibly implicating Smith as the source). There was no showing, indeed there was no pretense, that in fact Kelley adverted to such a chain of investigation and consciously failed to pursue it. In Kelley's mind, he was investigating a murder, not a sex offense. It was not shown that Kelley knew of a sperm typing technique or that his lack of such knowledge, or lack of sufficient understanding of the general subject to cause him to pass Smith's statement to the medical examiner for such use as that expert might make of it, constituted negligence on Kelley's part under accepted standards.

The medical examiner's testimony indicated that even in rape cases the practice has been to take a smear to

locate sperm but not to proceed to typing unless perhaps there appeared to be special cause for doing so. There are no facilities in Massachusetts for sperm typing; the specimen would have to be sent to Washington. No case in which this was in fact done was elicited in the testimony.

The judge's ultimate finding on the motion to dismiss was that "the Boston Police did not deliberately or even carelessly fail to conduct a normal, routine investigation of the alleged murder and consequently did not conceal or attempt to conceal any evidence of an exculpatory nature which might have been beneficial to the defendant." The finding was supported by the evidence. It is worth remarking that had typing taken place, it might not have excluded the defendant as the source of the sperm, and had it excluded him he would still have been a long way from exculpation of the crime. Among other possibilities: Although Smith may have had the intercourse, the defendant could still be the murderer; the sperm might have been a stranger's present in the victim's vagina before the intercourse in question which could have failed of climax or occurred with a male prophylactic.

The case, then, does not fall near the doctrine of *Brady* v. *Maryland,* 373 U. S. 83 (1963), which inveighs against governmental suppression of material exculpatory evidence. See *Commonwealth* v. *Hurst,* 364 Mass. 604, 607 (1974); *Commonwealth* v. *Stone,* 366 Mass. 506, 510-511 (1974); *Giglio* v. *United States,* 405 U. S. 150, 153-154 (1972); *United States* v. *Keogh,* 391 F. 2d 138, 146-148 (2d Cir. 1968); *United States* v. *Deutsch,* 475 F. 2d 55, 57-58 (5th Cir. 1973); anno. 34 A. L. R. 3d 16 (1970). We are not prepared to say — nor does the defendant appear in terms to urge the proposition — that omission of the police, not even shown to be negligent, to initiate investigations that might, but would by no means necessarily, have led to evidence favorable to the defend-

ant, amounts to a constitutional deprivation. Cf. *United States* v. *McCord,* 420 F. 2d 255, 258 (D. C. Cir. 1969).

It remains to note that the substance of the evidence as to the failure to recover the sperm and submit it to typing, which had been offered on the motion, was also presented to the jury during the examination and cross-examination of Sergeant Detective Kelley and the medical examiner; and whereas the judge in his instructions stated that the competence of the police was not an issue, the evidence was there to base any fair inferences by the jury. (Although the defense excepted to the judge's charge on the matter, they abandoned the exception by not assigning it as error.)

3. The defendant moved before trial for disclosure of the statements given to the police at headquarters on the morning of August 17 by prospective witnesses for the prosecution, Smith, Miss Thompson, and Fowler. The motion was denied. There was no error under the law as understood at the time (and indeed would not in itself be error under the practice here approved for the future). We need not repeat what was said at some length in *Commonwealth* v. *Stewart,* 365 Mass. 99, 102-108 (1974); though we were speaking there of the discovery of grand jury testimony, much the same has held for the discovery of other statements by prosecution witnesses; the decided cases have had a similar cast. See, e.g., *Commonwealth* v. *Galvin,* 323 Mass. 205 (1948). Under past practice it has been within the very wide discretion of the judge whether to allow or disallow discovery ahead of trial of a statement of a prospective prosecution witness, and a showing of "particularized need" has been in all events required. The more cogent occasion for the showing of need has been understood to be the time when the particular witness has given his testimony at trial; at that point a judgment could be better made, based, oftentimes, on weaknesses or discrepancies apparent from the testimony. See *Commonwealth* v. *French,* 357 Mass. 356, 377-378 (1970), judgments

vacated as to the death penalty sub nom. *Limone* v. *Massachusetts,* 408 U. S. 936 (1972). Cf. *Commonwealth* v. *DeChristoforo,* 360 Mass. 531, 534-536 (1971). But in the present case the defendant made no demand for discovery at the close of the direct testimony of any of the three witnesses.[6] The failure to renew the motion on an appropriate showing, and, in case of denial, to take precautions to save the matter for review, was a crucial omission under the going practice. Although what has been said is enough to dispose of the defendant's claim on this appeal, we may add that the defendant was not without his resources. There had been a probable cause hearing in the Municipal Court of the City of Boston on August 30 at which Miss Thompson and Fowler testified as well as Sergeant Detective Kelley (who testified to what Smith had told him); the defendant had a record of this hearing. Smith, Miss Thompson, and Fowler testified before the grand jury who indicted the defendant on September 19, and the judge ordered the prosecution to give the defendant access to inspect the grand jury minutes. Further, the defendant had tapes of statements by Miss Thompson and Fowler given to investigators for the defendant's then counsel who represented themselves as working for Smith.[7] There had also been an order requiring the prosecution to turn over any material in, or coming into, its possession whenever it became apparent that the material was exculpatory.

For reasons similar to those expressed in *Commonwealth* v. *Stewart,* 365 Mass. 99, 102-108 (1974), we

---

[6] This was all the more notable because on the question of the case for the .357 magnum revolver, Smith's statement at headquarters was referred to. See n. 4 above.

[7] We need not enter here into the legal and ethical questions raised by such methods of investigation. The prosecution evidently offered to give the defendant access to the statements it held, if the defendant would reciprocate with the tapes counsel had procured, but the offer was refused.

believe a showing of "particularized need" should be abandoned as a condition of securing the disclosure of the prior written statements of prosecution witnesses who testify at trial, just as it has been abandoned in respect to their grand jury testimony.[8]  Henceforth a defendant may, without such a showing, apply, by motion, for discovery of the prior written statements of prosecution witnesses which are available to the prosecution and are related to the subject matter of their testimony at trial;[9] and if the motion is granted, the statements will be delivered to defense counsel not later than the close of that testimony.  Written statements for this purpose include any statement made by the witness and in some definite way approved by him, a transcript of a contemporaneous verbatim or substantially verbatim stenographic or other recording of an oral statement by the witness, and a written report consisting of a statement by the witness.  The granting of the motion is not automatic; if the prosecutor has reason why a statement (or part of it) should not be disclosed, he may present it at the hearing on the motion.  Among the possible reasons which might result in denial, in whole or in part, of disclosure of a statement, would be lack of relation to the witness's testimony in court; danger to persons mentioned in the statement or other security reasons; commingling of the witness's remarks, as reported in a statement, with "work product" of the prosecutor to which the defendant would not be entitled to access.  The judge may condition the right of the defense to secure a witness's statement from the prosecution, on the reciprocal delivery by the defense

---

[8] See A. B. A. Project on Standards Relating to Discovery and Procedure Before Trial, § 2.1 (a) (i), (ii), and commentary, at 56-64 (Approved Draft 1970); 18 U. S. C. § 3500 (1970).

[9] This is cumulative to the obligation to turn over exculpatory material within the doctrine of *Brady* v. *Maryland,* 373 U. S. 83 (1963).

to the prosecution of all or part of a statement by the same witness given to the defense.[10]

In considering whether to allow a given motion for disclosure, the judge may be obliged to examine a statement in camera. If the judge denies or limits disclosure and the defendant objects, the material in question should be identified so that in case of conviction and appeal it may be sealed and transmitted to the reviewing court.

As was suggested in *Commonwealth* v. *Stewart, supra,* we would hope, in the interests of avoiding delay at trial, that in cases with no special problems counsel will be able to agree on a reasonable timetable for delivery of these statements; in the case of witnesses whom the prosecution will definitely call, it may well be feasible to arrange for delivery ahead of trial. (Written statements and the substance of any oral statements of a defendant, available to the prosecution, shall be delivered as matter of course to counsel for that defendant and counsel for any codefendant not later than the commencement of trial.)

The practice approved here is provisional and may be superseded when in the future Rules of Criminal Procedure covering the same subject matter go into force. The rules may, of course, differ from the practice here described.

*Judgment affirmed.*

---

[10] Our approval of reciprocal discovery in the present situation should not be taken to suggest that such discovery would be inappropriate or constitutionally impermissible in other situations. See *Williams* v. *Florida,* 399 U. S. 78, 80-82 (1970); *Wardius* v. *Oregon,* 412 U. S. 470, 471-472, 473-476 (1973). Cf. *Gilday* v. *Commonwealth,* 360 Mass. 170 (1971). The Committee on Criminal Rules of the Judicial Conference of the Commonwealth has under consideration the general subject of reciprocal discovery.