Walter M. LEWINSKI

v.

Theodore RISTAINO.

CA 76–1716–T.

United States District Court,
D. Massachusetts.

March 30, 1978.

Walter M. Lewinski, pro se.

Kathleen King Parker, Asst. Atty. Gen., Boston, Mass., for defendant.

Ropes & Gray, John Clark Kane, Jr. (CA), Boston, Mass., for plaintiff.

## OPINION

TAURO, District Judge.

Petitioner was convicted of second degree murder[1] for the slaying of a woman on August 17, 1973. His direct appeal on the same issues raised here was unsuccessful,[2] and he now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241, challenging the constitutionality of his conviction on the following grounds:

1) The denial of petitioner's pre-trial motion to examine statements of prosecution witnesses given to police shortly after the crime deprived petitioner of due process and the right to cross-examine and confront witnesses.

2) Police negligence in the investigation of the crime resulted in the loss of critically important evidence, and deprived petitioner of due process.

3) The denial of petitioner's requested instruction to the jury on involuntary manslaughter deprived petitioner of due process and equal protection of the laws.

I

Mary Lou Clark was killed in the early morning hours of August 17, 1973 in an apartment belonging to James Smith. Petitioner was charged with the murder. Smith was charged as an accessory after the fact, and was separately tried. The prosecution's case against petitioner was based principally on the testimony of three witnesses: Smith, and the two occupants of an adjoining apartment, Patricia Thompson and Larry Fowler.

Smith testified he had known Lewinski about two and a half years. They spent the evening of August 16 visiting taverns.

1. Mass.Gen.Laws ch. 265, § 1.

2. *Commonwealth v. Lewinski*, 367 Mass. 889, 329 N.E.2d 738 (1975).

Around midnight Smith and Lewinski returned to Smith's apartment, but Smith entered alone; Lewinski went off again. Smith was drunk and promptly "passed out" on his cot, but was awakened sometime thereafter by Lewinski and a female entering the dark apartment. It took Smith about five minutes to drift back to sleep, during which time Lewinski and the female started to make love on another cot in the same room.

Smith awoke a second time from the sound of a gun shot. He heard Lewinski exclaim, "My God, I have shot her." Entering the bathroom, Smith found Lewinski standing over the victim's nude body, holding a gun. At Lewinski's request, Smith helped Lewinski wrap the body in a sheet and carry it to a nearby alley. The two returned to the apartment, cleaned up, and left. Shortly thereafter they parted company. Smith was apprehended around dawn.

Thompson lived with her boyfriend Fowler in an apartment next door to Smith's. Thompson and Fowler had been friendly with Lewinski and Smith for about a year and a half.

According to Thompson's testimony, she and Fowler retired between eleven and midnight on the night of August 16. Approximately three hours later Thompson was awakened by a woman screaming, "My neck, my neck, Wally, my neck, please let go of my neck. You are hurting me." The screaming went on for some time, and she heard Lewinski telling the woman to shut up. Thompson then arose and walked through the outside corridor to Smith's door, where she continued to hear a woman's screams. After about five seconds, she returned to her apartment, leaving the door ajar and standing at the portal.

Shortly thereafter she heard a gun shot, and closed her door. Through the peep hole she observed Lewinski enter the hallway, look around and then return to Smith's apartment.

Fowler's testimony was consistent with Thompson's. He too heard voices in argument, though he could not identify them. When he finally rose from his bed, he peered out the window into the alley next to the building, and observed Lewinski standing there looking up and down, and then carrying and disposing of a female body.

At trial, the focus of the defense was the impeachment of prosecution witnesses.[3]

## II

Shortly after the homicide, Smith, Fowler and Thompson each gave statements to the police. Before trial, petitioner moved to examine the statements. The motion was denied, and never renewed.

While petitioner's action was pending before this court, the Commonwealth was ordered to turn over the statements to petitioner. Having reviewed these statements,[4] petitioner now argues that his ina-

---

3. On cross-examination, Smith acknowledged that he was bisexual, but denied the suggestion that he was attracted to Lewinski and jealous at his being with a woman. Smith also admitted to dealing in guns without a license. Fowler's record of criminal convictions was also put into evidence.

 The defense presented just two witnesses. Zygmund Krzyzanowski testified that he saw Lewinski, Smith and the victim drinking together at 1 a.m., thereby contradicting Smith's testimony that Smith had not seen the victim before returning to his apartment at about midnight. A police detective testified that Lewinski had phoned him on August 18, 1973, to make arrangements to turn himself in.

4. Petitioner had not seen the statements when he argued to the Massachusetts Supreme Judi-

cial Court that denial of his pre-trial motion was constitutional error. In rejecting petitioner's claim, that court relied heavily on petitioner's failure to renew the motion during trial:

> [I]n the present case the defendant made no demand for discovery at the close of the direct testimony of any of the three witnesses. The failure to renew the motion on an appropriate showing, and, in case of denial, to take precautions to save the matter for review, was a crucial omission under the going practice.

*Commonwealth v. Lewinski,* 367 Mass. 889, 329 N.E.2d 738, 746 (1975) (footnote omitted).

 Petitioner's arguments to this court were based on the statements themselves. This court does not have to reach the adequacy of the state court's rationale. Petitioner's claim before the state court nevertheless satisfies the

bility to use them at trial deprived him of due process and the right to cross-examine and confront witnesses.

 It is a violation of due process for the prosecution to suppress "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution," *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), or to withhold "evidence on demand of an accused which, if made available, would tend to exculpate him . . . ." *Id.* at 87–88, 83 S.Ct. at 1197. The prosecution, however, is not obligated to deliver wholesale its investigatory files to the defense. As the Supreme Court said in *Moore v. Illinois,* 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972), "We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case."

 Only "material" evidence must be provided to the defense. The burden on a petitioner to establish materiality varies depending on his efforts before and during trial to obtain the evidence. In *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), petitioner had made no request for exculpatory matter from the prosecution. After trial and conviction, however, evidence in the hands of the prosecution that petitioner considered material to his defense came to petitioner's attention. The Court held that, in the absence of a specific request, petitioner's burden in establishing materiality is to demonstrate that the evidence "creates a reasonable doubt that did not otherwise exist. . . ." 427 U.S. at 112, 96 S.Ct. at 2401.

The Court went on to suggest that a lower standard of materiality applies in a case such as *Brady v. Maryland,* 373 U.S.

83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). There, petitioner had requested before trial that the prosecution allow examination of a co-defendant's extrajudicial statements. Although several of the statements were turned over, a key statement was withheld, coming to petitioner's notice only after his trial and conviction. The Court noted that in a case such as *Brady* "implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." *Agurs* at 104, 96 S.Ct. at 2398.

 The facts here fall between *Brady* and *Agurs.* The defense made a specific request for production of witness' statements. The prosecution responded by putting the issue before the trial judge. The trial judge, while denying the defense request, put the prosecution under a continuing obligation to turn over exculpatory material. No extended discussion is necessary, however, as to which standard applies. By either standard, the evidence withheld falls well short of materiality.

1) At trial, Thompson testified that, while standing in the hallway outside Smith's apartment, she continued to hear the woman's screams which she had first heard while in bed. In her pre-trial statement, however, she indicated she heard no sounds during the brief period she stood in the hall. All her other trial testimony about the incident—hearing the initial sounds from her bed, going out into the hallway, then listening from the portal of her own apartment—is consistent with the pre-trial statement. The inconsistency involves just the five seconds Thompson stood in the hallway, and would have constituted a weak attack on her perceptions or credibility.[5]

2) At trial, Smith testified that he "started to drift off back to sleep" after Lewinski

---

requirement that he exhaust state remedies, see *Austin v. Swenson,* 522 F.2d 168 (8th Cir. 1975).

**5.** This court recognizes that evidence tending to impeach the credibility of prosecution witnesses can meet the test of materiality under certain circumstances. *See United States v.*

*Esposito,* 523 F.2d 242 (1975), *cert. denied,* 425 U.S. 916, 96 S.Ct. 1517, 47 L.Ed.2d 768 (1976). In this case, however, the court finds the evidence withheld would not have had a sufficient impact on the credibility of either Thompson or Smith to warrant granting a new trial.

and the victim began to make love, and that he was awakened by a gun shot. In his pre-trial statement he indicated he was "half asleep, half awake"; and that "when they [Lewinski and the victim] were finished [making love] they went into the bathroom and I don't know what happened in the bathroom but I heard a shot go off. . . . "

In his pre-trial statement, Smith might be indicating that he actually heard the couple enter the bathroom, thus presenting a conflict with his trial testimony. Alternatively, Smith might be drawing the conclusion that the couple entered the bathroom after making love from the fact that, upon waking from the gun shot, he found them there. The pre-trial comment is ambiguous and of negligible impeaching effect.

3) Smith's pre-trial statement suggests that the rights guaranteed him by *Miranda v. United States,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), may have been violated. After being informed of his right to remain silent, Smith indicated he did not wish to answer any questions about the incident. The detective continued to question him, however, and he responded. Petitioner argues that[6]

> had the jury been aware of Smith's unsuccessful and overriden attempt to invoke his *Miranda* rights, and the subsequent use of the illegally obtained statements against Smith to obtain his testi-

mony against the petitioner, there is a substantial likelihood that the jury would have discredited Smith's testimony and acquitted the petitioner.

*Miranda* is a Fifth Amendment decision protecting a suspect against compulsion to be a witness against himself. Here, the *Miranda* violation, if any, led to Smith's being a witness against Lewinski. Any doubt as to Smith's testimony against Lewinski stems not from some possible *Miranda* violation, but from Smith's self-interest in seeing Lewinski convicted rather than himself. This impeachment approach was utilized at trial by the defense. The pre-trial statement adds nothing new.[7]

■ The prosecution, of course, was duty-bound to disclose any understanding reached with Smith about future prosecution made contingent on his cooperation. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Bynum,* 567 F.2d 1167 (1st Cir. 1978). The withheld pre-trial statement, however, discloses no such understanding.

These discrepancies and omissions are trivial, particularly when evaluated in light of the substantial proof offered against Lewinski at trial.[8] The prosecution's case rested on three witness accounts which closely dovetailed, *see* Section I *supra.* The withheld information would not have seriously undermined a single key point.[9] No

---

6. Petitioner's Brief at 12.

7. This is not a case like *LaFrance v. Bohlinger,* 499 F.2d 29 (1st Cir.), *cert. denied,* 419 U.S. 1080, 95 S.Ct. 669, 42 L.Ed.2d 674 (1974), in which petitioner attempted at trial to prevent introduction of allegedly coerced statements of a defense witness. In the *instant* case, petitioner argues he had a constitutional right to present evidence to the jury on the alleged coercion itself. The standards of *Brady* and *Agurs,* not *LaFrance,* are controlling.

8. In *United States v. Agurs,* 427 U.S. 97, 112–113, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976), the Court commented:
 > [T]he omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable

validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

9. The potential effect of the withheld evidence in *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), and in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) seems far more substantial than the potential effect of the evidence withheld here. In *Moore,* the prosecution withheld information casting doubt on a prosecution witness' identification of defendant as the bar patron who had bragged to the witness about the murder. In *Agurs,* the prosecution withheld information on the victim's criminal record of violent behavior, though defendant claimed self-defense. In neither case was the conviction overturned. *See also Wagster v. Overberg,* 560 F.2d 735 (6th Cir. 1977); *United States v. Miller,* 499 F.2d 736 (10th Cir. 1974).

constitutional right of petitioner's was infringed by the prosecution's failure to turn over the pre-trial statements.

 In rejecting petitioner's challenge, the Massachusetts Supreme Judicial Court held that henceforth a defendant would be permitted, without a showing of particularized need, to review the pre-trial statements of prosecution witnesses, unless the prosecution could present a persuasive argument why the statements should not be disclosed. *Commonwealth v. Lewinski,* 367 Mass. 889, 329 N.E.2d 738 (1975). There is no indication that the holding was constitutionally based. Petitioner argues that the state court's refusal to apply the new rule to his case somehow deprives him of a constitutional right. As the Supreme Court made clear in *Moore,* a defendant has no constitutional right to automatic discovery of the prosecution's investigatory files. The state court's new rule goes beyond constitutional requirements,[10] and defendant is deprived of no constitutional right by the court's decision not to apply it retroactively to his case.

### III

 Petitioner surrendered to the police on August 21, about four days after the murder. During the arraignment and bail proceedings that day, petitioner's counsel first learned of Smith's allegation that petitioner and the victim had made love the night of the crime. On August 22, upon counsel's request, the medical examiner extracted a test sample of sperm from the victim's vagina. The sperm had already mixed with embalming fluid, however, and could not be "typed." It was impossible to tell whether it was the sperm of petitioner,

Smith, or some other individual. Petitioner argues that the failure of the police to conduct a sperm test promptly was negligence amounting to a deprivation of due process.

 Under the circumstances, it is by no means clear that the police conduct was negligent. The charge was murder, not rape. Petitioner has not demonstrated that the police violated any standard investigatory procedure by failing to order the test. The examination and typing of the sperm would not have been dispositive of guilt or innocence,[11] and it is not surprising that police attention was drawn elsewhere. In *Peoples v. Hocker,* 423 F.2d 960 (9th Cir. 1970), defendant was charged with murder. He claimed the victim had committed suicide, and argued that the police failure to make paraffin, fingerprint and ballistic tests deprived him of due process. There, the omitted tests would have yielded evidence going to the heart of guilt or innocence, but the court refused to find negligence, commenting:

> It would be an exceedingly delicate task to endeavor to establish criteria to tell when a certain quantum of police investigation constitutes due process and when it does not.

423 F.2d at 964.

Assuming *arguendo* that the police investigation was negligent, there is no authority to indicate that police negligence in investigation, without more, is equivalent to a denial of due process. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), has not been extended that far. The cases on which petitioner relies have two elements not present here. First, the police or prosecution did not refuse to conduct the

---

**10.** *Compare Robinson v. Neil,* 409 U.S. 505, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

**11.** Smith's pre-trial statement and trial testimony indicated that petitioner and the victim made love. Had the medical examiner found no sperm in the victim's vagina, Smith's account would remain unimpeached. The absence of sperm could have been explained by use of a prophylactic, or failure of consumma-

tion. Had the medical examiner found sperm attributable to someone other than petitioner, Smith's account would have been shaken, but petitioner would not have been removed from suspicion. *Compare Bowen v. Eyman,* 324 F.Supp. 339 (D.Ariz.1970) (test of sperm in rape case could have negated petitioner's guilt). If petitioner's sperm had been found, Smith's testimony against him would have been corroborated.

tests upon timely request or motion of the petitioner. Second, no evidence was presented that standard police procedures were violated.[12]

## IV

The trial judge charged the jury on second degree murder and voluntary manslaughter, but denied petitioner's motion to charge on involuntary manslaughter. Petitioner claims he was deprived of his rights to due process and equal protection under the Fourteenth Amendment.

There is considerable question whether relief by way of habeas corpus will properly lie for denial of a requested jury charge as to alleged criminal activity.[13] Assuming, without deciding, that denial of a requested charge can infringe constitutional rights, petitioner's challenge is without merit.

Massachusetts law requires a jury charge on involuntary manslaughter when the charge has a foundation in the evidence. *Commonwealth v. Campbell*, 352 Mass. 387, 226 N.E.2d 211 (1967). Federal courts have applied roughly the same standard to determine when a requested criminal charge is required.[14]

Under Massachusetts law, involuntary manslaughter is "an unlawful homicide, unintentionally caused . . . by an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct." *Commonwealth v. Clark*, 363 Mass. 467, 471, 295 N.E.2d 163, 166 (1973). The evidence at trial, however, did not remotely suggest that the killing was unintentional. It disclosed, instead, a pattern of purposeful behavior: an argument and struggle, a shot at close range, and disposal of the body.[15] Petitioner relies on two isolated comments to argue that the charge was required: his exclamation after the shooting, as reported by Smith, "My God, I shot her"; and a comment in Smith's pre-trial statements (never admitted into evidence) that Lewinski and Smith "were in kind of a daze" after the shooting. These reactions are entirely compatible, however, with a conviction on voluntary manslaughter,[16] a charge the jury passed over.

Petitioner's request for a writ of habeas corpus is denied. An order will issue.

12. In *Adams v. Stone*, 378 F.Supp. 315 (N.D. Cal.1974), defendant was charged with murder in the first degree. Upon arrest, he requested a blood or sobriety test from the officers but was refused. He argued that the denial of the test frustrated his defense of diminished capacity. The court found some merit in the claim, ordering the government to show cause why a writ of habeas corpus should not be granted. But the court relied expressly on the two elements noted above. In *Bowen v. Eyman*, 324 F.Supp. 339 (D.Ariz.1970), defendant was charged with rape. The court refused, despite a timely defense motion, to order the prosecution to conduct sperm tests which might have cleared defendant. The court granted a writ of habeas corpus, finding that the state's refusal to run the tests "is tantamount to a suppression of evidence such as there was in *Brady v. Maryland* . . . and a deprivation of due process." 324 F.Supp. at 340.

13. *Compare James v. Reese*, 546 F.2d 325 (9th Cir. 1976), *Gist v. Oklahoma*, 371 F.Supp. 541 (E.D.Okla.1974) and *Young v. Follette*, 308 F.Supp. 670 (S.D.N.Y.1970) *with Jacques v. Hilton*, 423 F.Supp. 895 (D.N.J.1976), *Parker v. Gray*, 390 F.Supp. 70 (E.D.Wisc.1975), *aff'd*, 530 F.2d 980 (7th Cir. 1976), and *Powell v.*

*Pennsylvania*, 294 F.Supp. 849 (E.D.Pa.1968), *appeal dismissed*, 425 F.2d 267 (3d Cir. 1970).

14. In *Parker v. Gray*, 390 F.Supp. 70 (E.D. Wisc.), *aff'd*, 530 F.2d 980 (7th Cir. 1976), the court required that a "reasonable view of the evidence" support the charge; in *Powell v. Pennsylvania*, 294 F.Supp. 849 (E.D.Pa.1968), "some evidence" was required. *See also Sansone v. United States*, 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965) for application of a similar standard under Rule 31(c) of the Federal Rules of Criminal Procedure.

15. *Compare Commonwealth v. McCauley*, 355 Mass. 554, 246 N.E.2d 425 (1969), where failure to charge the jury on involuntary manslaughter resulted in reversal of the conviction. The court noted that, "There was no evidence of any unpleasantness or anger or fights prior to the shooting," 355 Mass. 554, 557, 246 N.E.2d 425, 427, and held that defendant had the right to the jury's consideration of the denied charge.

16. Voluntary manslaughter is "a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat." *Commonwealth v. Bouvier*, 316 Mass. 489, 494, 55 N.E.2d 913, 916 (1944).