COMMONWEALTH vs. JAMES HALL.

Suffolk. October 6, 1975. — February 13, 1976.

Present: REARDON, QUIRICO, BRAUCHER, & WILKINS, JJ.

*Homicide. Practice, Criminal,* Discovery, Disclosure of evidence
   before grand jury, Examination of jurors, Capital case. *Evidence,*
   On cross-examination, Admissions and confessions.

On an appeal from a conviction of murder, this court could not deter-
   mine whether the defendant was prejudiced by the trial judge's
   denial of his requests for copies of police reports and probation
   and criminal records of prospective witnesses where such reports
   and records were not identified nor made a part of the record on
   appeal. [723-725]
In a case tried prior to *Commonwealth* v. *Stewart,* 365 Mass. 99,
   there was no reversible error in the denial "without prejudice" of
   the defendant's pre-trial motion to inspect the grand jury minutes
   where the denial did not impede defense counsel in the cross-
   examination of two witnesses on their previous identification of
   someone other than the defendant as the perpetrator, where the
   defendant failed to renew his motion during the course of the trial,
   and where the Commonwealth's evidence against the defendant
   was overwhelming. [725-728]
At the trial of an indictment for murder there was no abuse of dis-
   cretion in the trial judge's refusal to question each prospective
   juror as to his knowledge of "who Allah is." [728-730]
At the trial of a murder indictment exclusion of certain notes offered
   to impeach the credibility of a witness did not constitute an un-
   reasonable restriction of the defendant's cross-examination of the
   witness where the defendant failed to include the notes in the
   record or otherwise to disclose the contents thereof to this court on
   appeal and where the record revealed that extensive cross-exami-
   nation of the witness was permitted. [730-731]
In the cross-examination of the defendant in a criminal case a ques-
   tion concerning the defendant's refusal to answer questions during
   a police interrogation shortly after the crime, which was one of a
   series of questions designed to test the defendant's testimony that
   he could not remember any of his actions on the day of the crime

or for two days thereafter, did not violate the defendant's constitutional right to remain silent.   [731-734]

A defendant convicted on two indictments charging him with murder in the first degree and sentenced to death in the absence of a recommendation by the jury under G. L. c. 265, § 2, that the death penalty not be imposed was entitled, under *Furman* v. *Georgia*, 408 U.S. 238, to have the death sentences vacated and to be resentenced to life imprisonment but was not entitled to a new trial as a remedy for the unconstitutional sentences.   [734-736]

INDICTMENTS found and returned in the Superior Court on August 18, 1971.

Pre-trial motions were heard by *Roy, J.*, and the cases were tried before him.

*Malvine Nathanson* for the defendant.

*Kathleen M. Curry*, Assistant District Attorney, for the Commonwealth.

QUIRICO, J.   The defendant (Hall) and a codefendant, Raymond J. White, were indicted, tried and convicted for the following crimes, all allegedly committed on August 14, 1971:   murder in the first degree of Calvin Thorn, murder in the first degree of Harry T. Jeffreys, and armed robbery from the person of Thorn of $29,325 belonging to Freedom Foods, Inc.   The jury returned their verdicts on March 21, 1972, before the decision on June 29, 1972, in *Furman* v. *Georgia*, 408 U.S. 238 (1972), relating to the death penalty, and made no recommendation that the death penalty be not imposed. G. L. c. 265, § 2.   Each defendant was sentenced to death on each of the two indictments charging murder in the first degree and to a term of imprisonment for life thereafter on the indictment charging armed robbery.

The cases are before us on the appeal of Hall under G. L. c. 278, §§ 33A-33H, and his assignments of alleged error.   There are no appeals before us by White.   Each of the three indictments also named a third defendant, L. C. Clayton, who was not brought to trial.   He testified as a prosecution witness against White and Hall, and on March 22, 1972, the Commonwealth filed a nolle pro-

sequi as to him on each of the indictments. Because two of the cases before us on appeal are "capital cases" within the definition of those words in G. L. c. 278, § 33E, as amended through St. 1962, c. 453, the appeal in each of those cases transfers to this court "the whole case for [our] consideration of the law and the evidence."

By his brief Hall has argued five alleged errors relating to (1) the denial of requested pre-trial discovery of grand jury minutes, probation and criminal records of prospective witnesses, and police reports concerning the cases, (2) the refusal of the trial judge to question each prospective juror as to his knowledge of "who Allah is," (3) the limitation of Hall's cross-examination of a prosecution witness, (4) the cross-examination of Hall as to his refusal to talk to the police while under arrest, and (5) the unconstitutionality of the two death sentences.

The first three alleged errors assigned by Hall are based on exceptions duly saved before or during the trial; the last two are not based on any exceptions. We have held on numerous occasions that "an assignment of error under G. L. c. 278, §§ 33A-33G, brings nothing to this court unless based on a valid exception." *Commonwealth* v. *Chapman,* 345 Mass. 251, 255-256 (1962). *Commonwealth* v. *Gibson,* 368 Mass. 518, 525-526 (1975), and cases cited. That rule applies equally to capital cases within the definition of G. L. c. 278, § 33E, which empowers us to "order a new trial . . . only 'if satisfied' that because of error of law or of fact the verdict is a miscarriage of justice, or where because of newly discovered evidence or for some other reason justice requires a new trial." *Commonwealth* v. *Bellino,* 320 Mass. 635, 646, cert. denied, 330 U.S. 832 (1947). *Commonwealth* v. *DeChristoforo,* 360 Mass. 531, 540 (1971). We have examined all the alleged errors and conclude, for the reasons hereafter stated, that as to those based on exceptions there was no error, that as to those not based on exceptions there is no relief warranted or required

under § 33E, and that the only relief to which the defendant is entitled is in relation to the death sentences.

Before discussing each of the alleged errors, we state some highlights of the Commonwealth's evidence. On Saturday, August 14, 1971, an employee of the Freedom Foods supermarket on Columbia Road, Dorchester, called a bank to send some additional cash which was needed for cashing welfare checks for its patrons. Thorn, an employee of a private security force, arrived with the requested cash about 10:30 A.M. He had previously worked at the store as a security guard. He parked his car near the front of the store and went inside to get Jeffreys who was working there as a security guard. The two men then left the store and walked to the rear of Thorn's car. Thorn was in civilian clothes. Jeffreys was in the uniform of a security guard and was holding a gun in one hand. As Thorn opened the trunk of his car, two men rushed out of the store and started shooting at Thorn and Jeffreys from a distance of about three feet, wounding both of them. Jeffreys shot at the two men and wounded one of them. Thorn and Jeffreys were taken to a hospital and both died shortly thereafter from the gunshot wounds.

The two robbers took several bags of money from the trunk of Thorn's car and ran toward Columbia Road, with the wounded robber in a crouched position holding both hands around his groin or pelvic area. They entered a parked car and drove away on Columbia Road in the direction of Franklin Park. A witness saw that a chrome strip was missing from the right side of the car and he memorized the registration number on the car. The information ultimately reached the police.

On the afternoon of the day of the robbery the police found the car in question parked on a street near an apartment where Nina White, White's sister, lived. There were large amounts of human blood on the front seat, the steering wheel, the steering column, and on the dashboard all the way over to the right hand side of the

car. There was also a box containing nineteen live rounds of ammunition for a .38 caliber firearm. The box, originally containing fifty rounds, had been purchased by White on July 8, 1971. Several of Hall's fingerprints were found on this box.

The registration plates fastened to the front and rear of the car when it was found were those issued to Hall's wife for that car. In the trunk there was a Massachusetts registration plate which Clayton had borrowed from one Williams and given to Hall at Hall's request several days before the robbery. Hall told Clayton, who was his cousin, that he was going to rob the Freedom Foods store and did not want to use his own plates. Clayton borrowed the plate from Williams for that purpose.

A number of persons who witnessed the robbery and related events testified at the trial. Three of these persons were the manager, the general manager, and an employee of the Freedom Foods store, and the fourth was a customer at the store. All gave somewhat varying descriptions of the robbers to the police, and testified thereon at the trial. The store manager actually identified one of the robbers as White who had formerly worked for the same private security force by which the victim Thorn was employed. In that capacity White had occasionally worked at the store.

After interviewing some of the witnesses the police left the scene and went to White's home. From there they went to another address, 90 Columbia Road, Dorchester, about one-half mile from the store and there went to a third floor apartment occupied by White's sister, Nina. There were fresh, wet spots of what appeared to be blood on the stairs up to the apartment and on the floor of the hall in front of the door leading to the apartment. They knocked and Nina came to the door but did not let them into the apartment when they first sought entrance. About fifteen minutes later Clayton came out of the apartment, spoke to the officers, and went back inside. About ten or fifteen minutes later White came out of the

apartment with his hands over his head, and after some talk with him the officers entered the apartment.

Inside the apartment the police found the following. Hall was lying on a bed, naked and bleeding from the area of his groin, and there were blood spots on the bed sheets. Near the bed there were several "bank bags" and a paper shopping bag containing money, later determined to be in the amount of $19,325, and a bag containing an unascertained sum in coins. A bag containing an additional sum of $7,000 was found inside a vacuum cleaner in a closet. This had been placed there by Nina at the request of Hall. Beside Hall's bed there was a bucket containing about one quart of blood, some articles of clothing, and two complete and six empty .38 caliber shell casings. Two .38 caliber hand guns were found on a pile of laundry in a closet. They had been placed there earlier that day by Nina, when Hall arrived at the apartment, bleeding from a wound, and gave them to her.

Ballistics tests were performed on the two hand guns found in the apartment as described above, and on three spent bullets removed from the body of each of the two victims. The tests showed that the three bullets from the body of Jeffreys were fired by one of the hand guns, a .38 caliber Colt revolver, and that two of the bullets removed from the body of Thorn were fired from the other hand gun, a .38 caliber Iver-Johnson. The third bullet removed from Thorn's body was in a condition which did not permit a positive conclusion. The .38 caliber Colt revolver had been purchased by White at a gun store on June 21, 1971.

Nina White, testifying under a grant of immunity, gave the following information in addition to that already attributed to her above. White and Hall left her apartment together between 8 and 8:30 A.M. on August 14, 1971, the day of the robbery in question. They returned to the apartment about "10:45, close to 11" that same morning. At that time Hall was carrying an army

duffle bag with something in it and he was bleeding heavily from his left thigh. Nina applied a tourniquet to the leg to stop the bleeding. While she was doing this, Hall said to White: "If you had done what you were supposed to, I never would have been shot." Hall asked Nina to go down and wash the blood out of the car and she did so. The car was parked about half a block away on a nearby street. After her return to her apartment Clayton arrived there, and later the police arrived about 11:45 A.M. When the police knocked on the door Hall pulled a package of money from the duffle bag and gave it to her to hide in the vacuum cleaner. She did so.

Each defendant testified in his own behalf and was his only witness. The substance of Hall's testimony was that he had very little memory of what happened on August 14, 1971, because on that day he was "tripping off LSD." He said he did remember going to Nina White's apartment and finding himself accused of killing two people, and that he had gone there to pick up some marihuana. The substance of White's testimony was that on the date of the robbery he left his sister's apartment between 8:30 and 9 A.M., went to his house, and returned to his sister's apartment about 10:50 A.M., that he saw Hall there, bleeding from a leg, that he had seen Hall a couple of times but did not really know him, that he owned the Colt .38 caliber revolver used in the robbery and had left it at his sister's, that he knew both victims Thorn and Jeffreys, and that he had not gone to Freedom Foods and did not shoot the two men.

Before proceeding to the consideration of the alleged errors assigned by Hall and to the review of the two capital cases under G. L. c. 278, § 33E, we deem it necessary to comment on some unexplained delays in the prosecution of these appeals as disclosed, but not accounted for, in the record. The jury verdicts were returned on March 21, 1972. Appeals were claimed and motions for new trials were filed on March 27, 1972. The motions were heard and denied on June 22, 1972. The

required completed transcripts were delivered by the stenographer to the clerk on September 14, 1972. The requests for designations of pleadings were sent by the clerk to counsel on September 15, 1972. Notice of completion of the summary of the record was sent to counsel for Hall on April 4, 1973. General Laws c. 278, § 33D, at that time provided that the defendant should file assignments of error within ten days after that notice, and that he could apply for extensions for the filing of the assignments. (The time limits have since been changed by St. 1974, c. 458, § 2.) Hall's counsel filed neither an assignment of error nor a motion to extend the time for filing it in any of the cases. Predictably and inevitably, this resulted in the dismissal of the appeals and the affirmance of the judgments in the three cases on February 19, 1974.[1] Hall's trial counsel continued to be his counsel of record on the date of dismissal. He failed to take the action necessary to avoid the dismissals and he took no action thereafter to reinstate or otherwise avoid the consequences of the dismissals. Counsel in effect abandoned Hall and left him exposed to two death sentences and a life sentence. Thereafter a single justice of this court, acting on a petition filed by present appellate counsel appointed for Hall, authorized the late filing of assignments of error which are now before us.

Trial counsel's abandonment of his client is in most respects similar to his conduct in the case of *Commonwealth v. Stone*, 366 Mass. 506 (1974), also involving a defendant under sentence of death. This is a situation which warrants the attention of the Superior Court to determine what preventive, remedial or other action should be taken.

---

[1] General Laws c. 278, § 33F, provides in part: "If the defendant neglects to file an assignment of errors within the time specified in section thirty-three D, the appeal shall be dismissed by the superior court as a matter of course, unless further time is granted by a justice of the supreme judicial court, and the judgment appealed from be affirmed."

1. *Denial of pre-trial discovery.* On January 11, 1972, about two months before trial, Hall filed in each case seventeen motions that he be permitted to see or inspect originals, or that he be furnished with copies, of various papers, records, documents, memoranda, reports and other types of possible information or evidence. These motions included most of the "boiler plate" type of motions which currently seem to be filed indiscriminately in many criminal cases in the Superior Court. This plethora of motions also included one entitled "Motion for Discovery" which can best be described as an omnibus motion repeating in numbered paragraphs and lettered subparagraphs most of the same requests contained in individual motions filed on that same date, and covering a few additional requests. The practice of filing such motions apparently has grown to the point that such motions have been referred to as "routine pre-trial motions" and the failure to file them has been claimed to indicate per se incompetence or a deficiency in counsel's representation of his client. We rejected such a claim in *Commonwealth* v. *Saferian,* 366 Mass. 89, 98-99 (1974). In many cases a more discriminate and selective filing of such motions, limiting them to those which are likely to be productive or helpful in the particular case, would minimize the demands on the already overburdened court personnel, and it would probably deprive a defendant of nothing more than a hopefully contrived, but seldom productive, additional ground for appellate review. Most important, the quality of counsel's representation of a criminal defendant is certain to improve by following the practice of preparing and filing motions which are significant and appropriate to the particular case, instead of the blunderbuss approach of filing every known "boiler plate" type of pre-trial discovery motion.

It is almost impossible to determine from the record and transcript before this court just what action the judge took on the many separate, and the accompanying omnibus, pre-trial discovery motions. There is no question

that he denied Hall access to the grand jury minutes, and the first assignment of error raises that issue. Beyond that, appeal counsel also may have had difficulty in determining precisely what action was taken on the motions because the second assignment of error describes the alleged error only as "[t]he . . . denial of certain motions for pre-trial discovery," followed by a reference to certain pages in the transcript which, as indicated above, are not helpful. That language falls short of the precision required for the identification of rulings alleged to be erroneous.

Hall's brief joins the first and second assignments of error for purposes of argument, and limits the argument to "the refusal of the trial court to allow defense counsel to examine the *grand jury testimony, police reports, and criminal and probation records*" (emphasis supplied). We therefore limit our consideration to those three types of material, assuming but without deciding that the second assignment of error is legally sufficient.

At this point we note that on the record before us there is a question about the existence, identification and content of some of the material which Hall contends was wrongfully denied to him. There is no question that a transcript was made of the testimony presented to the grand jury. A copy of that was produced and it is now available to this court for inspection. From the fact that the prosecutor objected to the requests that he furnish Hall with copies of police reports, we may assume that there were some such reports, but if there were, they were not made a part of the record and are not now before us. The same is true as to any "criminal and probation records." Hall as the appealing party has the burden of showing in the record by agreement if possible, otherwise by evidence, the existence of the records he contends were wrongfully denied him. In *Commonwealth* v. *Lewinski,* 367 Mass. 889, 901-903 (1975), we stated a new rule to be applied prospectively to the effect that a defendant, without showing a particularized need

therefor, was entitled to apply by motion and receive a copy of prior written statements of prosecution witnesses. We then added (at 903): "If the judge denies or limits disclosure and the defendant objects, the material in question should be identified so that in case of conviction and appeal it may be sealed and transmitted to the reviewing court." That has not been done in this case as to any "police reports" or "criminal and probation records." It is thus not possible to determine whether Hall was prejudiced by the denial of his requests for those two types of material.[2] The right of appellate review cannot compel this court to engage in an intellectual exercise in the abstract.

In *Commonwealth* v. *Stewart*, 365 Mass. 99, 105-106 (1974), we declared a new rule that "[h]ereafter, on the defendant's motion, the court will routinely order the Commonwealth to supply defence counsel . . . with the grand jury testimony of any person called as a Commonwealth witness which is related to the subject matter of his testimony at trial. The defence will not be required to show 'particularized need.'" In several later cases we repeated that the new rule was prospective only. *Commonwealth* v. *Lewinski, supra* at 890-891. *Commonwealth* v. *Boyd,* 367 Mass. 169, 173 (1975). *Commonwealth* v. *Stone,* 366 Mass. 506, 513 (1974). In *Commonwealth* v. *Coleman,* 366 Mass. 705, 710 (1975), we said: "In *Commonwealth* v. *Stewart,* . . . [*supra*], we changed our practice and enlarged the right to production, but that was not because we acknowledged a constitutional right; had we done so, we would have had to consider more carefully whether the change should be only prospective, as we ruled it to be."

---

[2] Going outside the record, the Commonwealth's brief states that the government witness Nina White has no record, and that the government witness Clayton was adjudicated the father of an illegitimate child in 1969. The brief gives no such information on other government witnesses.

Hall, recognizing that the rule declared in the *Stewart* case is not based on constitutional grounds and is not to be applied retrospectively, argues that "[e]ven applying the now-rejected particularized need rule, the facts of this case demonstrate the necessity of examination of the grand jury minutes for the complete and adequate cross-examination of the Commonwealth's witnesses." We recognize that there is some merit in that argument. *Commonwealth* v. *DeChristoforo*, 360 Mass. 531, 535-536 (1971). *Commonwealth* v. *French*, 357 Mass. 356, 377-378, 399 (1970). *Commonwealth* v. *Carita*, 356 Mass. 132, 141-142 (1969).

The robbery and homicides occurred on Saturday, August 14, 1971. On Tuesday, August 17, 1971, the Freedom Foods store manager, Lindsey, went to a police lineup and identified Clayton as one of the two robbers. On the next day, August 18, he testified before the grand jury that White and Clayton were the robbers. The store's general manager, Burns, at that same lineup identified Clayton as the one "gunman" he had seen committing the robbery, and he testified to that effect before the grand jury on August 18. At the trial these two witnesses gave descriptions of the robber other than White, but were unable to make positive identifications of Hall as that robber. Both witnesses testified in their direct examination that at the lineup they had picked out another person (Clayton) as one of the robbers; and both witnesses were cross-examined on this subject by Hall's counsel, without limitation by the judge on the extent thereof. Hall was not in the lineup in question because he was confined to the hospital from August 14, 1971, to August 31, 1971, for the treatment of his gunshot wound.

Nina White also testified before the grand jury. The only apparent inconsistency between her testimony there and that which she gave at the trial relates to the sum of money which she hid in the vacuum cleaner. She told the grand jury that her brother, Raymond White, gave her that money. She told the trial jury that Hall pulled

the money out of a duffle bag, gave it to her, and told her to hide it.

Hall contends that the effect of depriving him of the material which he sought by his pre-trial motions was that he was denied his constitutional rights to the confrontation of the witnesses against him and to the effective assistance of counsel. We are concerned at this point only with the transcript of the grand jury testimony. It is clear from the trial transcript that Hall's counsel had full knowledge that soon after the robbery and homicides the witnesses Lindsey and Burns had identified the perpetrators to be White and Clayton. Counsel was in no way impeded in his cross-examination of the witnesses in that regard by the fact that he had not been allowed to see the grand jury transcript. As to the testimony of Nina White it is difficult to understand what difference it would make in the totality of the evidence whether the money which she hid in the vacuum cleaner was given to her by her brother or by Hall. In any event it was part of the proceeds of the robbery.

There is some question whether Hall laid the proper groundwork at the trial to allege error in the denial of his motions for the grand jury transcript. The docket entries indicate that these motions were denied pre-trial "without prejudice," and the transcript indicates that there might be a further consideration of such requests. This appears to contemplate that Hall could renew the requests during the trial. There is no indication that Hall ever renewed the requests. In dealing with a similar situation in *Commonwealth* v. *Lewinski,* 367 Mass. 889, 901 (1975), we said: "But in the present case the defendant made no demand for discovery at the close of the direct testimony of any of the three witnesses. The failure to renew the motion on an appropriate showing, and, in case of denial, to take precautions to save the matter for review, was a crucial omission under the going practice."

Although any one or several of the points discussed would be dispositive of Hall's claims of error in denying him the pre-trial discovery concerning the grand jury transcripts, police reports and criminal or probation records, we conclude further that if there was any error it was harmless beyond a reasonable doubt. *Chapman* v. *California*, 386 U.S. 18, 21-26 (1967). *Harrington* v. *California*, 395 U.S. 250, 254 (1969). *Commonwealth* v. *Baker*, 368 Mass. 58, 77 (1975). *Commonwealth* v. *Gilday*, 367 Mass. 474, 499 (1975). *Subilosky* v. *Commonwealth*, 358 Mass. 390, 397 (1970). The evidence against Hall was overwhelming. His codefendant, White, was identified by witnesses who knew him. Hall was shot in the holdup and was found wounded shortly thereafter, in an apartment with White and others. The money taken in the robbery was in that same apartment, as were the two revolvers which had been used to kill the victims. The witnesses Clayton and Nina White gave damaging testimony of admissions by one or both defendants. It is extremely unlikely that the material sought and denied by way of pre-trial discovery could have affected or changed the outcome of the trial.

2. *Examination of prospective jurors.* On the first day of the trial and before the empanelling of the jury, Hall's counsel informed the judge: "I have been instructed by the defendant Hall to request your Honor to ask this jury if they know who Allah is. He is a Mohammedan, and Allah is another word for . . . ."[3] The judge replied: "No, I will not." The defendant excepted, but did not expand on or attempt to state any further reasons for the request. Later the same day the judge inquired why Hall did not rise, presumably when the judge entered or left the court room, and counsel told him that Hall's "religion says that he can only stand for Mohammed."

---

[3] The definition of "Allah" in Webster's New Int'l Dictionary 67 (2d ed. 1959) is: "The Supreme Being of the Mohammedans."

In accordance with G. L. c. 234, § 28, as in effect at the time of the trial,[4] the judge examined each venireman as drawn "to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein . . . ." He also questioned each venireman with reference to his views and position on capital punishment. This was appropriate since these cases were tried before the decision in *Furman* v. *Georgia*, 408 U.S. 238 (1972), holding the death penalty unconstitutional when imposed pursuant to a statute which mandated such a penalty unless the jury, in the exercise of their discretion, recommended that the death penalty be not imposed. See G. L. c. 265, § 2; *Stewart* v. *Massachusetts*, 408 U.S. 845 (1972).

Hall contends that the judge's refusal to ask each juror whether he knew "who Allah is" was an abuse of discretion and a violation of his constitutional right to a fair jury trial. We disagree. We know of no constitutional, statutory or other legal requirement that a venireman know, or that he not know, "who Allah is" as a condition of, or qualification for, service as a juror. We refuse to interpose any such requirement in the law of this Commonwealth. The procedure followed for the empanelling of the jury in these cases complied in all respects with the law in effect at the time of the trial. Hall's exception to the judge's refusal to put the requested question is overruled.

Hall, by a process of analogical reasoning, asks that in these cases we apply the same rule and reach the same result as did the United States Supreme Court in *Ham* v. *South Carolina*, 409 U.S. 524 (1973), and as did the Court of Appeals for the First Circuit in *Ross* v. *Ristaino*, 508 F.2d 754 (1st Cir. 1974), cert. granted, 421 U.S. 987

---

[4]Section 28 was later amended by St. 1973, c. 919, which added a second paragraph thereto, authorizing further discretionary examination of jurors in certain circumstances described therein.

(1975), both of which cases involved requests to question prospective jurors concerning possible racial prejudice. The *Ham* and *Ross* cases involved precise questions clearly pointed toward discovering whether jurors were or might be biased or prejudiced against black defendants. By contrast, in the present cases we had a single question relating to a juror's knowledge, or lack of knowledge, on a religious subject. There is no factual analogy between the *Ham* and *Ross* cases and the cases now before us. Further we note that there is an unresolved difference of opinion between this court and the Federal Courts on the scope and applicability of the rule of the *Ham* case. See *Commonwealth* v. *Lumley*, 367 Mass. 213 (1975); *Commonwealth* v. *Ross*, 361 Mass. 665 (1972), judgment vacated, 410 U.S. 901, aff'd on rehearing, 363 Mass. 665, cert. denied, 414 U.S. 1080 (1973) (with dissents), grant of habeas corpus aff'd sub nom. *Ross* v. *Ristaino*, 508 F.2d 754 (1st Cir. 1974), cert. granted, 421 U.S. 987 (1975).

3. *Limitation of cross-examination.* Hall has argued broadly in his brief that the judge unreasonably restricted his cross-examination of the witness Nina White. However, the only applicable assignment of error is limited to a single exception, and it does not incorporate the six additional exceptions saved during the cross-examination which covers thirty-five pages of the transcript.

The state of the record is such that we are unable to pass on the single exception covered by the assignment of error. Nina testified that she visited Hall on August 16, 1971, while he was in the hospital, that she had sent two notes to the hospital for him, and that one of the notes was about his cousin. She identified her signature on a photostatic copy of the two notes. The copy was marked for identification and was then offered in evidence. In answer to questions by the judge defense counsel said that it was being offered "[t]o show the relationship to the defendant," and that "[i]t might" impeach her credibility. The judge excluded it and Hall excepted.

The disputed document marked for identification is not included in the exhibits available to this court, and it was not included in the records of the cases at the office of the clerk of the trial court. Hall's brief refers to the document, but does not reproduce it or otherwise disclose its contents. The responsibility for ensuring that the record on appeal includes the information and material essential to establish an assigned error is on the defendant. On the record before us, the exception to the exclusion of the photostatic copy of the notes must be and is overruled.

It is clear from a reading of the transcript that this is in no sense a situation in which the defendant was denied the right or opportunity to cross-examine Nina. While some questions asked by defense counsel were excluded, extensive cross-examination of the witness was permitted. We have held in numerous cases that "the scope of cross-examination, including to what extent the accuracy, veracity, and credibility of a witness may be tested, rests largely in the sound discretion of the judge, not subject to revision unless prejudice is shown to a party by reason of too narrow restriction or too great breadth of inquiry." *Commonwealth* v. *Smith*, 329 Mass. 477, 479 (1952). *Commonwealth* v. *Underwood*, 358 Mass. 506, 513 (1970). *Commonwealth* v. *Corcoran*, 252 Mass. 465, 486 (1925). The burden of showing an abuse of the judge's discretion is on Hall, and he has not sustained that burden, considering the cross-examination of Nina in its entirety.

4. *Reference to Hall's silence after arrest.* The crimes charged against Hall occurred about 10:30 A.M. on August 14, 1971. Hall testified in his own behalf that he left his home about 10 or 10:30 A.M. that day to go to apartment no. 10, 90 Columbia Road, Dorchester, to obtain some marihuana and that he was "tripping off LSD" at that time. The police found him at that apartment about 11:45 A.M. that same day, bleeding from a gunshot wound and took him to a hospital. On further

direct and cross-examination Hall's testimony appeared to be that because of his drugged condition he had little or no memory of anything which happened on August 14, 1971, that he definitely had no knowledge of participating in any robbery or homicide, of being shot, or of being taken to a hospital on that date, and that it was not until "a couple of days" after being taken to the hospital that he realized he was there. Hall's answers to almost all the questions put to him on direct and cross-examination concerning the armed robbery and homicides in question or any events occurring for about two days thereafter were that he did not know, or were otherwise in the negative.

In his cross-examination of Hall the prosecutor was testing the claim of lack of knowledge or of memory concerning the crimes alleged and events of the two days thereafter. Among the many questions by the prosecutor were the following: Q. "Well, you remember talking to Lieutenant Barry at the Boston City Hospital, that night [August 14, 1971], when you refused to talk to him. You said, 'I don't want to talk. I want my lawyer.'" A. "No, sir." Q. "You do not remember that?" A. "I don't even know him, sir." There was no objection or exception then or later to these questions and answers, there was no motion to strike them from the evidence, and there was no request at that time or at any other time during the trial for any instruction to the jury in relation thereto.

Hall now contends, through appeal counsel, that these questions violated his right under the Fifth Amendment to the United States Constitution to remain silent, and that the violation of that right entitles him to a new trial. We hold, for several reasons discussed below, that Hall is not entitled to relief on this point.

One decisive reason is, as noted earlier in this opinion, that Hall saved no exception on the point. But for additional reasons the result would be the same if an exception had been saved.

There is no question about the rule on which Hall is relying. In *Commonwealth* v. *Sazama*, 339 Mass. 154, 157-158 (1959), and again in *Commonwealth* v. *Burke*, 339 Mass. 521, 532 (1959), we said: "A man, being interrogated under circumstances which reveal that he is suspected of crime, even if not under arrest, certainly may properly assert his constitutional right to consult counsel and may refuse, on the advice of counsel or otherwise, to make statements. See art. 12 of the Declaration of Rights of the Constitution of Massachusetts. . . . A refusal to talk in the absence of counsel, or upon the advice of counsel . . . is not an admission . . . but an attempt to assert a constitutional right, which negates any inference of an admission. Such assertions by criminal defendants during police interrogations are not competent testimony against such defendants."

The question is whether the rule stated in the *Sazama* and *Burke* cases applies to the present cases. We believe that it does not. This is not a situation in which the prosecution was trying to prove an admission by a defendant or asking that an inference be drawn against him by reason of the exercise of his right to remain silent or his right to be represented by counsel. The prosecutor was not bound by Hall's claim that he had no knowledge or memory of anything he did or was doing at the time of the robbery and homicides in question and for a period of time thereafter. He had the right, within reasonable limits, to cross-examine Hall on that subject. The reference to statements attributed to Hall in a talk with Lieutenant Barry at the hospital did not exceed those limits. Hall said he had no memory of the conversation. Lieutenant Barry was not called as a witness. No other witness testified to such a conversation. The net result is that there was never any evidence that Hall had ever relied on his right to remain silent, or on his right to be represented by counsel before talking to Lieutenant Barry. It is therefore difficult to understand

any claim that Hall's rights under the Fifth Amendment were violated.

Finally, even if the prosecutor's question referring to a supposed statement by Hall that he did not want to talk to Lieutenant Barry and that instead he wanted his lawyer was improper, it does not follow that Hall would be entitled to a new trial. In our very recent decision (December 23, 1975) in *Commonwealth* v. *Morgan, ante,* 332, 342, "we reject[ed] an automatic rule which mandates a mistrial whenever the prosecutor questions a defendant concerning his silence in circumstances where the defendant had no duty to speak." In the present cases, as in the *Morgan* case (at 344), "the circumstances do not call for us to invoke an inflexible rule of general application or justify a conclusion that there was reversible, constitutional error." If the issue were before us on the objection and exception to the prosecutor's disputed question, we would conclude that the alleged constitutional error, if any, in allowing the question was harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 21-26 (1967). *Harrington* v. *California,* 395 U.S. 250, 254 (1969). *Commonwealth* v. *Baker,* 368 Mass. 58, 77 (1975). *Commonwealth* v. *Gilday,* 367 Mass. 474, 499 (1975). *Subilosky* v. *Commonwealth,* 358 Mass. 390, 397 (1970).

5. *Death sentences.* Hall personally requested his appeal counsel to contend before this court "that in light of the statutory scheme for imposition of sentence after a conviction for murder in the first degree, there is no power in this Court, or for that matter in any court, to impose a life sentence on him . . . [and] that the only remedy for the unconstitutional sentence is therefore a new trial." Counsel has advanced that argument in a supplementary brief.

General Laws c. 265, § 2 as amended through St. 1956, c. 731, § 12, provides in part: "Whoever is guilty of murder in the first degree shall suffer the punishment of death, unless the jury shall by their verdict, and

as a part thereof, upon and after consideration of all the evidence, recommend that the sentence of death be not imposed, in which case he shall be punished by imprisonment in the state prison for life." We have recently considered and rejected the contention that as a consequence of the decision in *Furman* v. *Georgia*, 408 U.S. 238 (1972), the only relief which this court can give to a defendant who was sentenced to death, the jury not having recommended that such sentence be not imposed, is a new trial. In *Commonwealth* v. *Cassesso*, 368 Mass. 124 (1975), we held that in such a case the Superior Court judge properly vacated the sentence as to the death penalty and imposed instead a sentence of imprisonment for life. That decision is dispositive of Hall's contention on this point. For other cases in which this court either has ordered or approved the imposition of a sentence of imprisonment for life in such circumstances, see *Commonwealth* v. *Stone, post,* 957 (1975), relating to *Commonwealth* v. *Stone,* 366 Mass. 506, 517-518 (1974); *Commonwealth* v. *Gilday,* 367 Mass. 474, 485-486 (1975); *Commonwealth* v. *McAlister,* 365 Mass. 454, 464 (1974), cert. denied, 419 U.S. 1115 (1975); *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 233-235 (1973); *Commonwealth* v. *LeBlanc,* 364 Mass. 1, 14-15 (1973). See also *Commonwealth* v. *A Juvenile,* 364 Mass. 103, 106-109 (1973); *Stewart* v. *Massachusetts,* 408 U.S. 845 (1972).

Accordingly, the judgment on each of the two murder indictments, in so far as it imposes the death sentence, is reversed, and the case is remanded to the Superior Court where Hall is to be resentenced to imprisonment for life on each indictment. We leave for decision by the judge of the Superior Court the question whether any or all of the three life sentences, the two to be imposed on the murder indictments and the one previously imposed on the armed robbery indictment, shall be ordered served concurrently or consecutively. We reject the request contained in Hall's brief that we review the life sentence

in the robbery case, or that we order a judge of the Superior Court to review it.

Our action in reversing the judgments in so far as they imposed death sentences and in ordering that life sentences be imposed on the murder indictments is based on the mandate of the United States Supreme Court in *Furman* v. *Georgia,* 408 U.S. 238 (1972). In our very recent decision in *Commonwealth* v. *O'Neal, ante,* 242 (1975), a majority of this court held, or concurred in a holding, "that the mandatory death penalty for murder committed in the course of rape or attempted rape violates the Massachusetts Declaration of Rights and is unconstitutional." Because of the purported limitation of the holding to death sentences for the crime of rape-murder, the *O'Neal* case does not apply to the present cases.

6. *Review under G. L. c. 278, § 33E.* As to each of the indictments charging Hall with murder in the first degree, we have considered the whole case on both the law and the evidence as required by G. L. c. 278, § 33E, and we conclude that the verdict on each indictment was neither against the law nor against the weight of the evidence and that the interests of justice require neither a new trial nor the entry of a verdict of a lesser degree of guilt than that found by the jury. The broad scope of the review which this court is required to make under G. L. c. 278, § 33E, in a capital case is not limited to questions based on exceptions saved during the course of the trial.

7. *Appellate review in robbery case.* In the case involving the indictment charging Hall with the crime of armed robbery, he is not entitled, as of right, to appellate review of any alleged error which is not based on an exception duly saved during the trial. However, because of the scope of statutorily prescribed review in the cases involving the indictments charging murder in the first degree, all alleged errors have been considered, whether based on exceptions or not.

8. *Order.*    Based on the foregoing, we order as follows.   The judgment on the indictment charging the crime of armed robbery is affirmed.   The judgment on each indictment charging the crime of murder in the first degree is reversed in so far as the death sentence was imposed, and each indictment is remanded to the Superior Court for the imposition of a sentence of life imprisonment thereon.   The question whether the resulting life sentences are to be concurrent or consecutive is left to the discretion of the sentencing judge.

<i>So ordered.</i>