GORDON T. GAUNTLETT *vs.* MEDICAL PARAMETERS, INC.

Middlesex.    April 22, 1980. — June 23, 1980.

Present: GRANT, BROWN, & NOLAN, JJ.

*Evidence,* Cross-examination. *Practice, Civil,* Comment by judge, Judicial discretion.

In an action to enforce a corporation's agreement to make monthly payments to the plaintiff for his service as a consultant, in answer to which the defendant alleged that the plaintiff had violated a noncompetition clause of the agreement, the judge abused his discretion in limiting the defendant's cross-examination of the plaintiff with respect to the competitive nature of the activities in which the plaintiff had been engaged and in commenting within the hearing of the jury on the futility of such cross-examination as the defense counsel had been permitted to conduct on the issue. [89-95]

CIVIL ACTION commenced in the Fourth District Court of Eastern Middlesex on April 15, 1976.

On removal to the Superior Court the case was tried before *Mitchell,* J.

*Charles E. Blumsack* for the defendant.

*Brian J. Sullivan* for the plaintiff.

NOLAN, J.    The plaintiff was the president, a director and the owner of fifty percent of the shares of the defendant corporation, which was organized in March, 1973.   The treasurer and owner of the balance of shares in the defendant corporation was A. Walter MacEachern.   The defendant functioned as a manufacturer's representative and sold medical equipment.   Patient monitoring devices which are used in intensive care units of hospitals were the principal products marketed by the defendant.

Negotiations for the sale of the plaintiff's stock in the defendant and termination of his stewardship as an officer and director resulted in the signing of an agreement dated Janu-

ary 9, 1975, by the plaintiff and by MacEachern in behalf of the defendant. The salient provisions of the agreement concerned the following: the sale of the plaintiff's stock to the defendant; the payment of $1,200 per month for twelve months by the defendant to the plaintiff for his service as a consultant; the plaintiff's promise to refrain from engaging directly or indirectly as an employee or employer, or in any other capacity, in the business in which the defendant had been engaged in the New England area or in New York for the twelve months beginning January 31, 1975; and the defendant's assumption of certain bank obligations of the plaintiff incurred in the operation of the defendant's business. When the defendant's monthly payments stopped after the plaintiff had received $4,800, he brought this action. The defendant's answer included, inter alia, allegations of fraud, laches, waiver, and most importantly, violation of the plaintiff's covenant not to compete. The jury trial occupied two days and resulted in a verdict for the plaintiff.

The defendant's appeal raises essentially three issues: (1) the correctness of the judge's limitation on cross-examination of the plaintiff by defense counsel and the judge's gratuitous comments within the hearing of the jury as to the futility of such cross-examination as counsel was permitted to conduct; (2) the propriety of the judge's conduct throughout the trial in criticizing and interrupting the defendant's counsel; and (3) a ruling on the admissibility of evidence under the best evidence rule which is not likely to arise again in a new trial. While we deplore the conduct of the trial judge in his arbitrary treatment of counsel, we do not reach the second and third issues because we reverse on the first issue.

The plaintiff went to work for General Electric Company (GE) on October 1, 1975, in its medical product division, which sold, among other products, patient monitoring equipment of a type which might be competitive with the defendant's products.[1] The plaintiff admitted that he helped the

---

[1] It is not at all clear whether the plaintiff sold equipment for GE in either New England or New York, the two areas denied the plaintiff in the agreement.

salesmen for GE sell its patient monitoring line within the prohibited period.[2]  The plaintiff denies that there was any

---

[2] The following extract from the transcript reveals the material portion of the cross-examination of the plaintiff.

' ' Q  Tell us what the patient monitoring equipment is.
  THE COURT. Would you please tell us what relevance it has to anything?
  COUNSEL FOR THE DEFENDANT. Yes, your Honor.  In Paragraph 4 it says that he will refrain from engaging in competition with the defendant, and I have a deposition from his employer, General Electric, who says in fact he was selling, —
  THE COURT. No, no.
  COUNSEL FOR THE DEFENDANT. You asked me.
  THE COURT. Ask him what he did.

Q  Sir —

  THE COURT. When did you work at General Electric, sir? When did you work for General Electric?
  THE WITNESS. I started employment with them in October — October 1, 1975.

Q  And when you worked — General Electric has various divisions?
A  That's correct.
Q  One of them is their Medical Products Division?
A  That's correct.
Q  You worked in Medical Products Division?
A  Yes.
Q  You were what they call a PDS specialist?
A  Yes.
Q  And a PDS specialist is someone who is involved in various types of monitoring equipment, correct?
A  Various types, that's correct.
Q  As a matter of fact, General Electric, the division that you were work-for, approximately 70 per cent of the business done by your division was done in connection with the — excuse me — let me get the term correct — standard monitoring equipment, correct?
A  70 percent of the business of G.E. Medical Division is standard monitoring equipment, is that what you're asking me?

  THE COURT. That's what he's asking you.

A  No, that's not correct.
Q  Is the bulk of sales — was the bulk of sales in your division — and by your division I mean that division in which you were employed and your superior was William Sutton — is it fair to say that the bulk of your sales was in the standard monitoring line?

competition between the type of monitoring equipment
with regard to which he was employed to help the salesmen

---

A    Well, to get it straight, the bulk of the sales of the Medical Division
     was X-ray equipment.
Q    Would you say —

     THE COURT. All right.

Q    What I'm asking you, sir, is it fair to say that the bulk of sales is the
     standard monitoring line?
     THE COURT. He said it was in X-ray equipment.
     COUNSEL FOR THE DEFENDANT. I don't know if x-ray equipment is
     part of that —

Q    — can you tell us?
A    X-ray equipment is the largest part of that Medical Division — of
     General Electric.
Q    X-ray equipment is included in what I said is the standard monitor-
     ing line, correct?

     THE COURT. How could X-ray equipment be monitoring equip-
     ment? I don't understand that.

A    This is kind of a technical question. If I can elaborate, I can prob-
     ably clear it up a little bit.
Q    Go ahead, elaborate.
A    I was PDS specialist. I did not directly sell monitoring equipment. I
     only handled their PDS line. Now, their PDS line is maybe only 20
     to 30 per cent of the monitoring line of equipment. I did not work
     with their standard monitoring equipment. I came in and helped
     salesmen when they got involved with large computerized patient
     management systems. I was working with the computerized patient
     management systems as a PDS specialist — trained and worked with
     salesmen.
Q    Did those —
A    To aid them in selling.
Q    Selling systems —
A    They sold monitoring equipment also.
Q    Isn't it true —
A    They sold x-ray equipment also.
Q    Isn't it true that that standard monitoring equipment in which you
     were involved with the salesmen was in direct competition with the
     Spacelabs equipment, namely, the Alpha line that Medical Para-
     meters was selling?
A    Absolutely not.
Q    Well, if I — does the standard monitoring equipment do essentially
     the same thing as the Spacelabs standard monitoring line does?
A    It does it in a more sophisticated, elaborate way.

and the type sold by the defendant. However, when coun-
sel for the defendant started to pursue the precise nature of

Q    The word I used was "essentially", sir.
A    Essentially monitors but also stores a lot of equipment.
Q    Isn't it true, sir, that Spacelabs is a direct competitor with General
     Electric for whom —
A    For their standard monitoring equipment, yes.
Q    And the people over whom you had supervisory capacity were sell-
     ing that equipment?
A    I never had supervisory capacity over them.
Q    The salesmen with whom you dealt, who were selling G.E. equip-
     ment, sold standard monitoring equipment?
A    Yes, they did.  G.E. has many lines of equipment.

     THE COURT. All right, he's not getting anywhere with this — ab-
solutely not, — trying to compare General Electric with Medical
Parameters.

Q    Is it your testimony, sir, that General Electric did not compete with
     Medical Parameters, Inc., in connection with the standard monitor-
     ing equipment?

     THE COURT. So what if they did?  He said they did compete, but
so what?  He said he didn't compete.
     COUNSEL FOR THE DEFENDANT. He said that his salesmen, the peo-
ple he dealt with, did sell it and —
     THE COURT. So what?  That doesn't make any difference with
him.  I instruct the jury it doesn't make any difference.  You've got
to show that he, personally, competed — not the General Electric.

Q    Did you help support those people who sold equipment?
A    Yes, but only for PDS equipment.

     THE COURT. That's what he said before, which has nothing to do
with monitoring equipment.

Q    Is it your testimony that the PDS equipment is different than the
     standard monitoring line?
A    Very much so.
Q    Tell us how.
A    Well, No 1, the cost of the equipment — it ranges from upwards to
     $50,000.00 per bed, per installation.

     THE COURT. As opposed?

A    As opposed to Seven to Ten Thousand Dollars per bed for the Space-
     labs equipment.  The big difference is that it incorporates a data
     computerized system.  There is a terminal keyboard which displays
     all sorts of information which can be tracked, and on a critically ill
     patient, can be stored for follow up by the physician.  It's a totally

the product which the plaintiff sold or, at least aided other employees of GE to sell, the judge not only cut him short

---

different — it is a totally more sophisticated type of system. People who would be a candidate for that, probably would not be a candidate for standard monitoring equipment. If the choice were made by the customer to go with the computerized system, it would no longer be computerized on a standard monitoring basis.

Q   Did you deal directly with customers who would be interested in purchasing the standard line of PDS equipment?

THE COURT. He said that he didn't have anything to do with the standard line.

A   I did not deal with the standard line. They had pacemakers —

THE COURT. All right.

Q   The salesmen with home [*sic*] you worked, did they go out to sell PDS equipment as well?

THE COURT. Come on, let's get off that. So what if they did?

A   They sold every line —

THE COURT. Please, you don't have to answer.
All right, anything else?
COUNSEL FOR THE DEFENDANT. Yes.

Q   Did the people with whom you worked, the sales people, sell —

THE COURT. I told you not to ask the question because it's irrelevant as far as I'm concerned.
COUNSEL FOR THE DEFENDANT. No, it isn't. May I be heard at the bench?
THE COURT. No, you may not. You may object but I'm telling you to stop. Is it clear?
COUNSEL FOR THE DEFENDANT. No, your Honor, it isn't. I would like to put it on the record as to the basis of my objection.
THE COURT. I'm not going to let you put the basis of your objection on the record. I'm the one who is objecting. You're not objecting.
COUNSEL FOR THE DEFENDANT. May I ask the court the reasons?
THE COURT. I said it's irrelevant.
COUNSEL FOR THE DEFENDANT. May I tell the court at the side bar the relevancy?
THE COURT. No
COUNSEL FOR THE DEFENDANT. May I tell the court the materiality?
THE COURT. No. It's so obvious that you don't need to tell me. You're trying to show he was competing, and you're not getting any place. You're really not.

but said that he was going nowhere in attempting to show the competitive nature of the product. His comments were audible to the jury. Apparently, the judge adopted the view that the defendant was required to prove that the plaintiff personally sold the competing products, that the type of monitoring equipment dealt with by the plaintiff was not in competition with the type sold by the defendant, and that the plaintiff's participation in training and working with salespersons who sold admittedly competing equipment fell outside the scope of the restrictive covenant. This was error. A jury could find that the relevant clause of the agreement was sufficiently broad to encompass activity of the type described by the plaintiff.

The extent of cross-examination is largely discretionary. See *Commonwealth* v. *Hall*, 369 Mass. 715, 731 (1976). However, the trial judge's discretion is not unbridled. See *Jennings* v. *Rooney*, 183 Mass. 577, 579 (1903); *Commonwealth* v. *Franklin*, 366 Mass. 284, 289-290 (1974). Crucial to the defendant's case was evidence that the plaintiff violated the noncompetition clause of the agreement. He should have been permitted to explore more fully and without judicial interruption this important sector. Compare *Ott* v. *Board of Registration in Medicine*, 276 Mass. 566, 574 (1931).

The judge's comments as to the futility of the defendant's pursuit of the plaintiff's violation were not consistent with the judge's role as an impartial magistrate. See *Federal Natl. Bank* v. *O'Keefe*, 267 Mass. 75, 83 (1929). They constituted an invasion of the jury's fact finding function in violation of G. L. c. 231, § 81. The effect of these remarks may have been "to throw the weight of the judge's opinion in the scales against the defendant." *Commonwealth* v. *Foran*, 110 Mass. 179, 180 (1872). See *Olson* v. *Ela*, 8 Mass.

---

COUNSEL FOR THE DEFENDANT. I object to the court's comments. I think that's for the jury to decide.
THE COURT. All right, well fine, that's for the jury to decide. Anything else? Counsel?"

App. Ct. 165, 167-169 (1979). The judge's final comment at this juncture, "All right, well, fine, that's for the jury to decide," does not purge the judge's earlier observation, "You're trying to show he was competing, and you're not getting any place. You're really not." More to the point, the judge gave no curative instruction to the jury.

*Judgment reversed.*